IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MATTHEW P. AMOS, CHRISTINE A. | : | |
| AMOS, ROBERT A. ABEL, PAMELA | : | CIVIL DIVISION |
| MOBIUS ARMSTRONG, DAVID L. | : | |
| ENGLEHART, DONALD A. ERNEY, | : | No. 1:CV-10-1285 |
| TIMOTHY P. FARRELL, KEVIN M. | : | |
| FINN, DAWSON E. FLINCHBAUGH, | : | |
| CAROLE A. FOWLER, PATRICIA A. | : | JUDGE WILLIAM W. CALDWELL |
| HELM, BRUCE G. HOLRAN, RONALD | : | |
| N. HUGHMANICK, JANET C. | : | |
| NACLERIO, EDWARD R. NORFORD, | : | |
| RONALD L. PROUGH, WILLIAM J. | : | |
| REGAN, LOUIS M. ROBINSON, BRUCE | : | |
| A. SMITH, CHARLOTTE SPITZ, ROBERT | : | |
| M. TROXELL, JANET M. WESTCOTT, | : | |
| CURT H. ZIMMERMANN, RICHARD | : | |
| ZLOGAR, JEFFREY S. NICKUM, | | : |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | Filed by ECF |
| FRANKLIN FINANCIAL SERVICES | : | |
| CORPORATION; LOWELL R. GATES; | : | **JURY TRIAL DEMANDED** |
| LINDA LEE GATES; NICHOLAS J. | : | |
| DUNPHY; WILLIAM T. HABACIVICH; | : | |
| CHARLES J. HENRY, ANDREW W. | : | |
| KOHR; and SUSAN A. RUSSELL, | : | |
| | : | |
| Defendants. | : | |

## <u>FIRST AMENDED COMPLAINT</u>

The above-identified plaintiffs, by and through their attorney, Michael A. Farnan,

hereby allege as follows:

### <u>Nature of the Action</u>

1.      This is a civil action for, inter alia, violations of the Racketeer Influence

and Corrupt Organizations (RICO) Act (18 USC §1961 et seq.), conversion, fraud in

the inducement, breach of fiduciary duty, unjust enrichment, waste of corporate assets, and conspiracy.

## **The Parties**

2.    The following plaintiffs were non-defendant shareholders of Community Financial, Inc. (CFI) before the dissolution of CFI as a result of its acquisition by Franklin Financial:

     a.    Matthew P. Amos, who resides in Harrisburg, Pennsylvania;

     b.    Christine A. Amos, who resides in Harrisburg, Pennsylvania;

     c.    Robert A. Abel, who resides in Enola, Pennsylvania;

     d.    Pamela Mobius Armstrong, who resides in Clarence, New York;

     e.    David L. Englehart, who resides in Harrisburg, Pennsylvania;

     f.    Donald A. Erney, who resides in Harrisburg, Pennsylvania;

     g.    Timothy P. Farrell, who resides in Williamsburg, Virginia;

     h.    Kevin M. Finn, who resides in Middletown, Pennsylvania;

     i.    Dawson E. Flinchbaugh, who resides in Camp Hill, Pennsylvania;

     j.    Carole A. Fowler, who resides in Mill Hall, Pennsylvania;

     k.    Patricia A. Helm, who resides in Palmyra, Pennsylvania;

     l.    Bruce G. Holran, who resides in Elizabethtown, Pennsylvania for part of the year and part of the year in Lake Clear, New York;

     m.    Ronald N. Hughmanick, who resides in Camp Hill, Pennsylvania;

     n.    Janet C. Naclerio, who resides in Emigrant, Montana;

     o.    Edward R. Norford, who resides in Camp Hill, Pennsylvania;

     p.    Ronald L. Prough, who resides in Williamsburg, Virginia;

q.   William J. Regan, who resides in Hummelstown, Pennsylvania;

r.   Louis M. Robinson, who resides in Harrisburg, Pennsylvania;

s.   Bruce A. Smith, who resides in Mechanicsburg, Pennsylvania;

t.   Charlotte Spitz, who resides in Harrisburg, Pennsylvania;

u.   Robert M. Troxell, who resides in Lancaster, Pennsylvania;

v.   Janet M. Westcott, who resides in Cape May Point, New Jersey;

w.  Curt H. Zimmermann, who resides in Dillsburg, Pennsylvania;

x.   Richard Zlogar, who resides in Harrisburg, Pennsylvania; and

y.   Jeffrey S. Nickum, who resides in Harrisburg, Pennsylvania.

3.      Community Financial, Inc. (CFI), is the holding company of Community Trust Company (CTC), which was acquired by Franklin Financial Services Corporation in 2008.

4.      Defendant Franklin Financial Services Corp. (Franklin Financial) operates as a holding company for Farmers and Merchants Trust Company of Chambersburg, Franklin County, Pennsylvania, that provides commercial, retail banking and trust services in Pennsylvania.  Franklin Financial Services Corporation acquired CFI by merger agreement dated August 8, 2008, wherein CFI was merged with and into Franklin Financial, in a cash out merger, and Franklin Financial became the successor corporation to CFI.  Franklin Financial  is a "person" as defined at 18 U.S.C. §1961(3).

5.      Defendant Lowell R. Gates is an attorney who has served as corporate legal counsel, shareholder, president, director, and Chairman of the Board of Directors of CFI at various times relevant to this matter.  He is a "person" as defined at 18 U.S.C. §1961(3).

3

6.      Defendant Linda Lee Gates was a shareholder in CFI who benefited financially from the actions of her husband, Defendant Lowell Gates, as more fully set forth below.  She is a "person" as defined at 18 U.S.C. §1961(3).

7.      Defendant William T. Habacivch was a shareholder and director of CFI. He is a "person" as defined at 18 U.S.C. §1961(3).

8.      Defendant Susan A. Russell was president and chief executive officer of CFI at various times relevant to this lawsuit.  She is a "person" as defined at 18 U.S.C. §1961(3).

9.      Defendant Nicholas J. Dunphy was a shareholder and director of CFI.  He is a "person" as defined at 18 U.S.C. §1961(3).

10.     Defendant Charles J. Henry was a shareholder and director of CFI.  He is a "person" as defined at 18 U.S.C. §1961(3).

11.     Defendant Andrew W. Kohr was a shareholder and director of CFI.  He is a "person" as defined at 18 U.S.C. §1961(3).

## Jurisdiction and Venue

12.     The U.S. District Court for the Middle District of Pennsylvania has jurisdiction pursuant to 28 U.S.C. § 1331 because several claims arise under the laws of the United States and 28 U.S.C. §1332 because the amount in controversy exceeds $75,000 and at least five plaintiffs reside outside of the Commonwealth of Pennsylvania; and over pendant state-law claims herein pursuant to supplemental jurisdiction, 28 U.S.C. § 1367(a).  See also 18 U.S.C. §1964(c).  Venue is proper in this judicial district pursuant to 28 U.S.C. §§1391(b) and (d).

## The Scheme

13.    The defendants, including Franklin Financial, Defendant Lowell Gates who served as Chairman of the Board of Community Financial, Inc.; his wife Defendant Linda Gates; Defendant Susan Russell, who served as CFI President; and the other defendants who were board members of CFI at various times relevant to this litigation, constitute an "enterprise" whose actions affected interstate commerce as defined at Section 1961(4) of Title 18 of the United States Code known as the Federal Racketeer Influenced and Corrupt Organizations (RICO) statute (18 U.S. §1961(4) which defines a RICO "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.")

14.    Generally, the scheme involved Defendants Lowell Gates, Dunphy, Habacivich, Henry, Kohr, and Russell leading non-defendant shareholders, including plaintiffs, to believe that their business was sound.  Then, through an insider loan agreement with board members and management, those individual defendants received stock at its book value at change of control of CFI to Defendant Franklin Financial as well as interest on the loan.  Those defendants oversaw the diminution of assets, profited to the detriment of the plaintiffs and other non-defendant shareholders by receipt at or near the very last day of CFI's existence of more than 1.3 million shares of CFI that effectively diluted the value of the shares of the plaintiffs and other non-defendant shareholders, who had collectively owned approximately 100,000 shares or roughly a little less than one-half of the company before the stock dilution.  Defendant Franklin Financial benefited from the sweetheart deal of obtaining a company with more than $70 million in assets under management, reaping estimated annual returns of

$700,000, and a $500,000 corporate headquarters for a mere $1,130,000. In addition, Defendant Franklin Financial stated in the August 8, 2008 Proxy Statement, set forth at Exhibit D, and incorporated fully herein, that it had conducted a full due diligence review of CFI and CTC prior to the merger, and, upon information and belief, through this review was made fully aware of, and was fully complicit in the scheme. Franklin Financial further assumed successor liability for all actions by CFI and CTC and the individual defendants, for all actions occurring prior to the Effective Date of the merger.

15.     The individual defendants, with the express approval of Franklin Financial, worked in conspiracy to convert property rightfully belonging to the plaintiffs and other non-defendant shareholders, for the defendants' own benefit and enrichment. According to the Proxy Statement, set forth at Exhibit D, and incorporated fully herein, Franklin Financial was deeply involved and fully participated in all aspects of the scheme, including but not limited to assuming control of all payment to former CFI shareholder after the Merger. At page 28 of the Proxy Statement, it is clearly stated that Franklin Financial would calculate and determine the amount of money which each former CFI shareholder shall receive as part of the transaction, and would receive and hold all CFI stock certificates for cash payment. Franklin Financial further informed CFI shareholders that it would provide a Liquidating Trust in the event of an increase in payment to CFI shareholders over the $2.79 cents per share set forth as the Merger Agreement. **See Exhibit D.**

16.     Plaintiffs and other shareholders were thwarted from identifying the illicit scheme through efforts by the individual defendants to deny access to shareholders lists,

such as in the *Helm* litigation, and financial information of CFI, such as by the letter of Defendant Russell to Plaintiff Matthew Amos refusing to provide financial information pertaining to CTC. **Exhibits A & B.**

17.    Plaintiff Matthew Amos desperately tried to ascertain the end-game of the defendants, whose hostility toward him and contempt for other non-defendant shareholders percolated just below the surface, by hastily filing a derivative action in the Court of Common Pleas of Cumberland County in late August 2008. Eventually, that action was dismissed well before Plaintiff Amos could figure out the defendants' elaborate scheme.

18.    Again, unbeknownst to plaintiffs and undisclosed to the all shareholders, Defendants Lowell Gates as well as his wife Linda Lee Gates, William T. Habacivch, Susan A. Russell, Nicholas J. Dunphy, Charles J. Henry, and Andrew W. Kohr, (collectively the "Individual Defendants") conspired to concoct and enact a scheme to profit themselves, at the expense of other non-defendant shareholders, including the plaintiffs in this lawsuit, by their deliberate and systematic mismanagement of CFI. Defendant Lowell Gates had a previous relationship with Franklin Financial, which was the Administrator of the multi-million dollar estate of deceased family members of Lowell Gates. Franklin Financial provided the final but essential component of the scheme by becoming the vehicle by which it and the individual defendants benefitted at the expense of the plaintiffs and other shareholders, who received pennies per share in a payout orchestrated and overseen by Franklin Financial after the effective date of the change of control to Franklin Financial.

19.     The individual defendants loaned $200,000 to CFI in 2005 in exchange for repayment with interest or the ability to convert shares of stock based on the "book value per share . . . on the closing date of the change in control."  CFI 2005 Annual Report, Note 4.

20.     From that moment on, the individual defendants had every incentive to drive down the book value of CFI so that they could convert the notes "on the closing date of a change in control" at bargain prices and dilute the interests of all the other shareholders, including the plaintiffs to this lawsuit.

21.     Then, sometime before mid 2008, Defendant Gates and the other individual defendants conspired with Franklin Financial to enter into a merger agreement.  This merger agreement resulted in receipt of approximately $1.13 million from Franklin Financial which was supposed to be dispersed based on the number of shares owned of CFI.  Defendant Lowell Gates and the other individual defendants aggressively took steps to diminish CFI assets further during this timeframe in order to reduce the "book value" of shares before the date of the acquisition of CFI (i.e., change of control), so that they could dilute the value of all other shareholders' shares, including the plaintiffs' shares, by acquiring acquiring roughly 1.3 million shares at or about the change of control date themselves and dividing the $1.13 million according to the number of shares owned by each shareholder.  At p. 29 of the Proxy Statement, set forth at Exhibit D, and incorporated fully herein, Franklin Financial explicitly prohibited CFI officials from issuing, selling or authorizing additional stock or issuing or granting options or similar rights with respect to CFI's capital stock, or any securities convertible into capital stock, without written consent of Franklin Financial.    In

addition, Franklin Financial explicitly prohibited CFI from entering into, or amending any new change of control agreement with any director or officer, without the written consent of Franklin Financial. And, Franklin Financial assumed full successor liability of CFI and CTC as a result of the cash-out merger. **See Exhibit D.**

## History

22.    In the early 1990s, Defendant Lowell R. Gates created a non-profit Pennsylvania corporation called Community Trust Company of Pennsylvania (CTCP).

23.    Thereafter, by letter dated August 26, 1992, the Pennsylvania Department of Banking (PDB) informed Defendant Gates, the sole shareholder and who acted as President, Chief Executive Officer (CEO), and Chairman of the Board of CTCP, that a non-profit fiduciary could not use the term "Trust" in its name.

24.    Acting as, among other roles, corporate counsel, Defendant Lowell Gates then created a new legal entity, to which he transferred CTCP's assets, called Pennsylvania Fiduciary and Estate Services, Inc. (PENNFES), a Pennsylvania corporation, which incorporated on or about September 3, 1992.

25.    Defendant Gates was the sole shareholder until on or about October 31, 1996 and from 1992 to 1998, acted as corporate counsel, President, CEO, Chairman of the Board, and secretary of PENNFES.

26.    PENNFES acted as a non-profit fiduciary until October 11, 1998, when Defendant Lowell Gates converted it to a trust corporation called Community Trust Company (CTC) regulated by the Pennsylvania Department of Banking.

27.    The Pennsylvania Department of Banking (PDB) required an initial capitalization and maintenance of $1 million for CTC to be chartered and to operate.

28.    Defendant Lowell Gates and his wife, Defendant Linda Lee Gates, acquired 2500 shares of CTC stock and Defendant Lowell Gates received an additional 21,600 shares as a result of the conversion of shares of PENNFES in 1998. Defendant Linda Lee Gates acquired an additional 1600 shares of CTC stock.  In addition, through Defendant Lowell Gates, warrants were acquired for a total of 27,700 shares of CTC stock owned by the couple with a value of a little more than $550,000, at an Internal Revenue Service 5498 reported value of $20 per share.

29.    Community Trust Company (CTC) was established under the laws of the Commonwealth of Pennsylvania in 1998 to provide trust services to persons in and out of the Commonwealth of Pennsylvania.

**Creation of Community Financial, Inc.**

30.    In 2000, at Defendant Lowell Gates' direction, a holding company known as Community Financial, Inc. (CFI), was formed, and all CTC shares were converted in kind to CFI shares.  During this time frame, the Pennsylvania Department of Banking placed CTC under a Memorandum of Understanding (MOU) for failing to maintain the $1 million in capitalization required to maintain its charter.

31.    CTC became a wholly-owned subsidiary of CFI, which held all CTC's common stock.

32.    CTC and CFI engaged in interstate commerce.

33.    CFI continued to grow in value as investors placed large sums of money in trust with CTC, CFI's wholly owned subsidiary.  In fact, according to the "Proxy Statement for the Merger Between Community Financial, Inc. and Franklin Financial Services Corporation" correction letter dated September 3, 2008, CFI had in excess of

$70 million in assets under management and fee income of nearly $700,000.00 for the year ended December 31, 2007.  Exhibit D.

34.     CFI management recapitalized the $1 million in shareholders' equity utilizing a second private securities offering in 2002.  This offering indicated that management, including Defendant Lowell Gates, would maintain capitalization at the $1 million amount.  Defendant Linda Gates acquired an additional 45,000 shares at $8 per share for $360,000 bringing his total shares after exercising warrants to 72,700 shares of CFI stock.

35.     Without informing plaintiffs, Defendant Lowell Gates plotted a cynical method of enriching himself and the other defendants, by following a theory known as "Creative Destruction," developed by German economist Joseph Schumpeter, whom Defendant Lowell Gates referenced in the CFI 2002 Annual Report.  Under this economic theory, profits can be obtained from the financial failure of a business concern.  With this state of mind, Defendant Lowell Gates and other individual defendants, including his CFI Board members and management, who are defendants here, began to deceive CFI non-defendant shareholders like plaintiffs into believing that Defendant Lowell Gates and the other defendants were fulfilling their corporate fiduciary responsibilities while actually overseeing the destruction of CFI using a sophisticated scheme.  At that time, nobody but the defendants knew of the defendants' plan to engage in "Creative Destruction" to profit obscenely from the downfall of CFI by eventually selling the company to co-conspirator Franklin Financial at a price calculated to ensure the individual defendants either substantially covered their losses or reaped colossal gains and the purchasing co-conspirator Franklin Financial would

obtain control of a company with more than $70 million in assets under management with substantial tax benefits due to losses for a little more than $1 million.

36.     Beginning sometime in the mid-2000s, Defendant Lowell Gates and the other defendants set about systematically to gain control of the Board of Directors through control of a voting block on the Board, involving the other defendants. Defendant Russell was the perfect patsy for the scheme, doing as instructed with no questions asked.  The group controlled by Defendant Lowell Gates had succeeded in ousting Plaintiff Matthew Amos as a Director.  Defendant Lowell Gates surrounded himself with co-conspirators willing to further his scheme of "Creative Destruction" unobstructed by any opposition.  In the years following, Defendant Lowell Gates oversaw and plotted a sure and steady decline in the fortunes of CFI, while falsely representing to non-defendant shareholders, including the plaintiffs, that every effort was being made to make CFI profitable.  In so acting, he and the other defendant board members and management violated their fiduciary duties to CFI and its shareholders, including plaintiffs.  The former CFI board members and managers involved in that scheme are defendants in this action.

37.     Defendant Lowell Gates and other individual defendants, who were board members and management of CFI, defied PDB "Minimum Capital Requirements," by allowing capitalization to drop below the $1 million threshold required by law at around 2002.

38.     In a private placement memorandum dated May 5, 1998, CTC officials had represented to non-defendant shareholders that the PDB required CTC to maintain capitalization in excess of $1 million.

39.    The Private Offering Prospectus dated June 14, 2002, similarly cited the PDB's "mandate" that CTC maintain capitalization of $1 million.

40.    According to CTC officials, CTC was required to show capitalization of $1 million at the time CTC filed quarterly call reports.  One of the accounting schemes used by Defendant Lowell Gates and the other individual defendants, who constituted at various times CFI's Board of Directors and management, was the use of "intercompany receivables" to artificially inflate stated shareholder equity to misrepresent CTC as complying with the PDB capitalization requirements.  CFI's annual reports read that inter-company receivables were included as assets on CTC's balance sheets but were characterized as "eliminations" when the consolidated report was compiled.  Importantly, only CTC was required to file a quarterly call report with the PDB, not CFI or any other affiliated companies.

41.    By letter dated April 25, 2006, from Defendant Susan A. Russell, CTC President and Chief Operating Officer, to a request by Plaintiff Matthew P. Amos made through legal counsel for the call reports, Defendant Russell declined to provide the call reports pursuant to Section 1508 of the Pennsylvania Business Corporation Law (15 Pa.C.S. §1508) because "your client is not a shareholder of Community Trust Company…."  In her words, "[t]he Integrity Bank line of credit is an obligation of Community Trust Company, not an obligation of Community Financial, Inc."  In doing so, Defendant Russell utilized a shell game to hide the illicit conduct of the defendants by refusing to disclose financial transactions and regulatory capitalization compliance information to CFI non-defendant shareholders, who had capitalized CTC, regarding the activities of CFI's wholly-owned subsidiary, CTC.  **Exhibit A.**

42.    Using an Integrity Bank line of credit to further mislead plaintiffs and other non-defendant shareholders and the Pennsylvania Department of Banking (PDB) into believing CTC was solvent and compliant with PDB requirements, Defendant Lowell Gates, working through his enterprise, straddled the line between corporate fiduciary duty and PDB regulatory compliance, effectively challenging non-defendant shareholders, who rightly expected directors to act in the fiduciary best interest of the company, and PDB regulators, who rightly expected trust companies to comply with applicable laws and regulations, to take adverse action.

43.    Initially, CFI was authorized to issue 2,000,000 shares of common stock with par value of $1.00 per share, and 500,000 shares of preferred stock, par value $1.00 per share.

44.    At or around 1998, shares in CTC/CFI were sold at $20 per share.

45.    The holders of CFI common stock would be entitled to one (1) vote per share.

46.    In 2002, CFI had a stock offering again to raise capitalization of CTC above $1 million to conform to the capitalization requirements of the Pennsylvania Department of Banking.

47.    CFI non-defendant shareholders, including the plaintiffs, were not given preemptive rights to acquire any securities subsequently issued by CFI.

48.    CFI directors and management, including Defendant Lowell Gates and the individual defendants, gave themselves authority to raise additional capital and make acquisitions through the issuance of CFI common stock without necessitating CFI shareholder approval.

49.     Defendant Lowell Gates and the other individual defendants, who were CFI directors and management, acting in conspiracy with all defendants, actively attempted to hide from CFI non-defendant shareholders, including plaintiffs, the facts of CTC's deterioration from being a financially-sound corporate entity by blocking efforts to obtain information the defendants deemed to be information relating to CTC, CFI's wholly-owned subsidiary.  **See Exhibit A.**

50.     Shareholders infused more than $1 million of capital in CTC at or around 1998 prior to CTC becoming the wholly-owned subsidiary of CFI.

51.     A second offering issued at or around 2002 again raised capitalization above $1 million to satisfy the requirements of the Pennsylvania Department of Banking. At this time, shares were sold for $8 per share.

52.     As of August 13, 2004, at 4:30 p.m. the total number of shares of CFI was 201,071, with the individual defendants, who were directors and former directors, an officer and a relative, owning or controlling 97,536 shares, or 48.508 percent of the total shares.

53.     As of September 19, 2005 at 4:30 p.m . the total number of shares of CFI was 201,071, with the individual defendants, who were directors and a former director, an officer and a relative, owning or controlling 97,536 shares, or 48.508 percent of the total shares.

54.     As of December 31, 2005, the total number of shares increased to 206,071, with the afore-referenced individual defendants owning or controlling 102,536, or 49.76%, after a loan was issued to the company by certain individual defendants.

55.     As of August 24, 2006, the total number of shares remained at 206,071, with individual defendants owning or controlling 102,536 shares, or 49.76 percent.

56.     As of December 31, 2006, the total number of shares increased to 208,571 as a result of Defendant Lowell Gates exercising 2500 warrants at $20 per share, when shares obviously were not worth anything close to that.  In fact, CFI represented to the Internal Revenue Service that the price per share was $13.88 as of December 31, 2006. Defendant Gates exercised his warrants at the higher price so that the individual defendants now owned or controlled 105,036 shares, or 50.36 %, and those co-conspirators would have voting control of the company.

57.     As of September 7, 2007, the total number of shares was 208,571, with individual defendants owning 105,036 shares, or 50.36 percent, enabling them to control the direction of the company, including effectuating the merger with Franklin Financial and ensuring the demise of CFI.

58.     CFI had 208,571 shares of stock issued, including Lowell Gates and his wife (76,800 shares), William T. Habasivich (14,000 shares), Susan Russell (2,126 shares), Nicholas Dunphy (9,110 shares), Charles Henry (1,500 shares), and Andrew Kohr (1,500 shares).  The total number of shares owned or controlled by these individual defendants at that time was 105,036, a majority interest collectively.

59.     CFI's articles of incorporation authorize 2,000,000 shares of common stock and 500,000 shares of preferred stock. The CFI board of directors, who are individual defendants in this action, gave themselves the authority to raise additional capital and make acquisitions through the issuance of CFI common stock without

further approval by CFI shareholders. Series A Capital notes with change of control provisions are not mentioned in either the articles of incorporation or the CFI by-laws.

60.    In the proxy statement issued in anticipation of the proposed acquisition of CFI by Franklin Financial in 2008, the following statement was buried in a litany of other statements:

### RISKS REGARDING CFI COMMON STOCK

***CFI can issue common stock and preferred stock without your approval, diluting your proportional ownership interest.***

CFI's Articles of Incorporation authorize it to issue 2,000,000 shares of common stock and 500,000 shares of preferred stock. As of August 1, 2008, CFI has no shares of preferred stock outstanding, and has 208,571 shares of common stock issued and outstanding.

61.    The CFI proxy statement near the time of the merger with Franklin Financial dated August 8, 2008, estimated that CFI shareholders would have received $2.79 per share if the effective date of the merger had occurred on July 1, 2008. Exhibit D. Many non-defendant shareholders voted to approve the sale of CFI based on that information. The defendants thus utilized the classic "bait and switch" fraudulent sales technique.

62.    According to Defendant Franklin Financial, that estimate was based upon the CFI book value of $212,053 as of June 30, 2008 and the assumption that all Series A Capital Notes would be converted to CFI common stock. **Exhibit C.**

63.    After June 30, 2008, CFI incurred additional operating losses orchestrated by the defendants, who controlled CFI, and, as a result, reported a CFI book value of $31,514 in its audited financial statements as of October 31, 2008. **Exhibit C.** The

value of CFI diminished rather precipitously in just four months as the defendants engaged in "Creative Destruction."

64.    It is believed and therefore averred Franklin Financial joined in the creative destruction by utilizing CFI assets to pay the costs associated with completing the merger, thus driving down the value of CFI.

65.    Based on the book value as of October 31, 2008, CFI's book value per share became $.15 and resulted in the issuance of 1,366,380 of new shares to the individual defendants, who were engaging in their scheme of first destroying the value of the company and then defrauding other non-defendant shareholders, including plaintiffs, by diluting the value of their shares and acquiring a huge amount of additional shares at the lower value.  **Exhibit C.**  Using this chicanery, the individual defendants claimed more than 1,470,000 shares compared to the total non-defendant shareholders' shares of 103,535.  In effect, the individual defendants went from owning just over 50 percent of CFI to claiming more than 93 percent of the shares essentially by a stroke of a pen, enabling them to either substantially cover their losses or reap obscene profits at the time of the merger.

66.    The individual defendants, including the aforementioned six shareholders, consisting of an officer and board-members, controlled CFI to the detriment of the plaintiffs and other non-defendant shareholders by breaching their fiduciary duty owed to the plaintiffs and other non-defendant shareholders and CFI by engaging in their scheme of "Creative Destruction" to waste CFI assets.  One of the individual defendants is the wife of the former chairman of the board and mastermind of the scheme.

18

67.    In a transaction consummated on or about November 29, 2008, Franklin Financial acquired CFI for $1,130,000, of which approximately 62 non-defendant shareholders received less than 7 percent of the proceeds of the sale.

68.    The conclusions stated herein were derived from utilizing financial planning expertise and "reverse engineering" the sale. As a result of the transaction, CFI non-defendant shareholders received approximately $.71 per share, which would reflect a total number of shares issued of approximately 1,574,951 shares, assuming the sale price of $1.13 million. The number of shares at the moment of sale, 1,574,951, is roughly seven and half times more than the 208,571 shares that existed prior to the "change of control" transaction on or about the last day of CFI's existence.

69.    The individual defendants who converted their notes obtained stock presuming a value of $.15 per share but approximately thirty (30) days received a payout on their interest from Franklin Financial at the rate of $.71 per share, which is more than a tripling of the value in approximately a thirty-day period. Meanwhile, the plaintiffs and other shareholders, many of whom voted in favor of the deal before the payouts were finally calculated, saw the value of their stock drop from approximately $2.79 in June 2008 to $.71 in October 2008.

70.    Assuming 208,571 CFI shares that existed on June 30, 2008 that were worth approximately $.71 at the time of the sale to Franklin Financial in 2008, which include the individual defendants' original share ownership prior to their receipt of a massive number of shares which defrauded the plaintiffs and other non-defendant shareholders by diluting stock value, those shareholders existing on June 30, 2008 received and thus had to divide approximately $150,000 for those shares.

71.    The approximately 62 non-defendant shareholders, including the plaintiffs, who collectively owned 103,535 shares on June 30, 2008, divided less than $75,000 between them.

72.    By contrast, Defendants Lowell Gates and his wife, Habacivich, Russell, Dunphy, Henry, and Kohr, divided approximately $1,050,000, as the result of the afore-described scheme to defraud the non-defendant shareholders, including plaintiffs.

73.    Defendants Lowell Gates, Habacivich, Russell, Dunphy, Henry, and Kohr, all of whom were members of the board of directors or officers, along with Defendant Linda Gates, divided approximately $1,050,000 largely as a result of the last-minute dilution of CFI stock by the defendants acting in conspiracy.

74.    The individual defendants intentionally breached their fiduciary duty by driving down the value of CFI in its last days before the merger with Franklin Financial to $.15 per share, so that they could receive a massive amount of stock at the change of control and thus benefit by receiving an unjust portion of the $1,130,000 purchase price of CFI and leave the plaintiffs and other non-defendant shareholders "holding the bag." This was "Creative Destruction" in practice.

75.    For that to occur, the individual defendants issued to themselves 1,366,380 shares at the last minute on the closing date of the change in control relying on insider knowledge as board members and President of CFI.

76.    In addition, Franklin Financial oversaw, approved of and participated in the destruction of the value CFI without objecting, even though it had agreed to pay $1,130,000 at a time when the book value of the company was worth $1.02 per share but ultimately received a company whose book value was $.15 per share.  Defendant

Franklin Financial had, for several months prior to the merger date, been actively involved in overseeing and reviewing the internal operations of CFI, including, but not limited to, as part of its due diligence.   Upon information and belief, Franklin Financial had been closely connected to the individual defendants for far more than a year prior to that date, and possibily as early as 2004, when Franklin Financial began administering the multi-million dollar estate of the deceased aunt and uncle of Lowell Gates.

77.    The following chart illustrates the reported market value of shares of CFI stock from at or about its inception in 1998 to its acquisition by Franklin Financial according to CFI Annual Reports and other CFI corporate sources:

| Valuation Date | | |
|---|---|---|
| | 12/31/1998 | $20.00 (IRS, Reported price per share) |
| | 12/31/1999 | $20.00 (IRS, Reported price per share) |
| | 12/31/2000 | $20.00 (IRS, Reported price per share) |
| | 12/31/2001 | $8.04 (IRS, Reported price per share) |
| | 12/31/2002 | $8.03 (IRS, Reported price per share) |
| | 12/31/2003 | $11.93 (IRS, Reported price per share) |
| | 12/31/2004 | $13.88 (IRS, Reported price per share) |
| | 12/31/2005 | $13.88 (IRS, Reported price per share) |
| | 12/31/2006 | $13.88 (IRS, Reported price per share) |
| | 12/31/2007 | $13.88 (IRS, Reported price per share) |
| | 6/30/2008 | $13.88 (IRS, Reported price per share) |
| | 12/31/2008 | $.71748 (IRS, Reported price per share) |

78.    The precipitous decline in share value was the result of defendants' scheme to engage in "Creative Destruction," by devaluing CFI, wasting assets, and

diluting shares so as to defraud the unsuspecting non-defendant CFI shareholders, including the plaintiffs, many of whom were elderly, of the value of their shares.

79.    CFI was controlled by the individual defendants, who engaged in an enterprise to defraud plaintiffs and other non-defendant shareholders. The defendants issued additional stock to themselves, who were engaged in this enterprise, that resulted in the dilution of book value per share of CFI common stock.

80.    In CFI's 2007 Annual Report, which was issued in September 2008 during the merger process, it states the following:

During 2005, Community Trust Company, as part of its capital plan, issued non-negotiable Series A Capital Notes to certain directors of the Corporation.  Proceeds from the issuance totaled $200,000.  The notes bear interest at 6% per annum commencing December 31, 2007.  Interest expense of $6,000 was paid on June 30, 2008.

The Notes are unsecured.  As an incentive to participate in the issuance, each note holder was issued 250 shares of Community Financial, Inc. stock for every $10,000 lent to the corporation.  **The Notes also have change in control provisions that allow note holders to convert their notes into Community Financial stock.  The number of shares to be issued would be based on the book value per share of the Company on the closing date of a change in control.**

(Emphasis added.)  CFI 2008 Proxy statement Exhibit 5-8 & 9.  This scheme worked because individual defendants actively destroyed the company in its last days to reduce the book value of shares and Defendant Franklin Financial went along with this scheme by not only failing to object but actually participating in the scheme by using CFI assets to pay the costs associated with the transaction.

81.    The following chart illustrates the "unadjusted book value (unaudited)" of shares of CFI stock from at or about its inception in 1998 to its acquisition by Franklin Financial:

| Valuation Date | 12/31/1998 | $10.13 |
|---|---|---|
| | 12/31/1999 | $10.10 |

|            |        |
|------------|--------|
| 12/31/2000 | $9.43  |
| 12/31/2001 | $6.61  |
| 12/31/2002 | $5.12  |
| 12/31/2003 | $4.03  |
| 12/31/2004 | $3.43  |
| 12/31/2005 | $3.36  |
| 12/31/2006 | $3.32  |
| 9/30/2007  | $2.77  |
| 12/31/2007 | $1.68  |
| 6/30/2008  | $1.02  |
| 10/31/2008 | $.15   |

It was the value as of October 31, 2008 that was used to calculate the price per share issued to Defendant Lowell Gates and the other individual defendants, who participated in an illicit scheme to defraud the non-defendant shareholders, including the plaintiffs, by diluting the value of all other investors.

82.    It is believed and therefore averred that the following defendants were members of CFI's Board of Directors and lenders under the scheme referenced in the preceding paragraphs:

a.  Andrew Kohr ($10,000)

b.  Charles Henry ($20,000)

c.  Nicholas Dunphy ($50,000)

d.  Lowell Gates ($60,000)

e.  William Habasivich ($50,000)

f.  Susan Russell ($10,000)

83.    It is believed and therefore averred that the dollar amounts in the parenthetical in the preceding paragraph represents the amount of the "loan" issued to CFI by each defendant as part of the scheme to defraud the other non-defendant shareholders, including the plaintiffs.

84.    The $1,130,000 price of CFI minus the roughly $150,000 paid to shareholders including the defendants owning or controlling the 208,571 shares that existed in June 30, 2008 leaves a difference of approximately $980,000.

85.    It is believed and therefore alleged that Defendants Lowell Gates and his wife, Habacivich, Russell, Dunphy, Henry, and Kohr, received approximately $980,000 through the above-described scheme.  The non-defendant shareholders, including the plaintiffs, who were largely responsible for CFI meeting the $1 million capitalization requirement of the Pennsylvania Department of Banking in 1998 and 2002 by infusing collectively hundreds of thousands of dollars, divided about $75,000.

86.    This dilution of shares was part of a scheme to defraud plaintiffs and other non-defendant shareholders, who did not benefit from this inside deal available only to Defendants Lowell Gates and his wife, Habacivich, Russell, Dunphy, Henry, and Kohr. Those defendants benefited from insider knowledge and sweetheart deals at the expense of other non-defendant shareholders, including the plaintiffs.

87.    It is further believed and therefore alleged that Defendant Susan Russell, former President of CFI, also received some of the approximately $980,000 proceeds of this transactional scheme as a reward for her active participation and approval of the scheme and her willingness to breach her fiduciary duties as President of CFI to the corporation and thus its other non-defendant shareholders, such as plaintiffs.  This scheme benefited a select few shareholders, who owned and controlled shares and who are also defendants in this case.

88.    To maximize the value of their interest, it was critical for the individual defendants to ensure that the value of CFI diminished in the weeks leading up to the

finalization of the acquisition by Franklin Financial to enable them to acquire more shares at a lower "book value per share …. on the closing date of a change in control," as set forth above.  This was the essence of the "Creative Destruction," a scheme formulated and executed against plaintiffs and other non-defendant shareholders. According to the Proxy Statement, at p. 29, CFI could not engage in any activity outside a good faith effort to preserve its business organization intact, without the express written consent of Franklin Financial. **Exhibit D**.

**Pattern of Racketeering Activity**

89.     In or around August 2001, Gates entered into a transaction with Mary K. Solenberger, wherein he transferred the proceeds of her Individual Retirement Accounts (IRA) to an irrevocable trust administered by CTC which resulted in litigation for damages and punitive damages by Solenberger's estate's executors alleging that Defendant Lowell

> "Gates' conduct was motivated by a desire to benefit himself financially by allowing his trust company [CTC] to control Decedent's funds, and thereby earn fees.  In addition, Gates' conduct in this case reflects a pattern of self-dealing conduct whereby Gates encourages clients to transfer money to his trust company [CTC] without advising them of the unfavorable tax consequences associated with the transfer."

*Solenberger v. Gates*, No.  03-2005 (Cumberland County CCP), Amended Complaint ¶26.   It is believed and therefore averred that that case settled with a substantial payout to the Solenberger estate.  Although CTC was not a defendant in that litigation, Defendant Lowell Gates used CTC to engage in fraudulent acts.  It is believed and therefore averred that Defendant Lowell Gates in conjunction with some or all of the individual defendants utilized the mails and/or telephone to effect this fraud upon Mary Solenberger and/or her estate in violation of 18 U.S.C. §§1341, 1343.

90.    In 2003, another client of Defendant Lowell Gates, Marie Magaro, sued Defendant Lowell Gates, his law firm, and CTC for more than $1 million in damages, because Defendant Lowell Gates' self-serving legal advice resulted in Ms. Magaro executing a prohibited transaction with her individual retirement account (IRA) under Internal Revenue Service (IRS) rules.

91.    According to Magaro's expert witness, the then-President of CTC Kerry L. McLaughlin investigated and disclosed the problem with the IRA to Ms. Magaro, and the CTC board members.  As a result, McLaughlin was summarily fired by Defendant Lowell Gates on January 9, 2003.  According to the documents filed in the *Magaro* lawsuit, by letter of January 12, 2003, Defendant Gates proposed a cover-up of the prohibited transaction from the tax authorities, a clear example of mail fraud, wire fraud, obstruction of justice, money laundering, bank fraud, and monetary transaction fraud in violation of 18 U.S.C. §§1341, 1343, 1503, 1951, 1956.

92.    According to documents filed in the *Magaro* lawsuit, "CTC allowed itself to be browbeaten [by Gates] into making improper loans without any documentation or authority whatsoever.  … CTC did not have procedures in place to deal with issues where Mr. Gates was involved in a conflict between CTC's interest and a customer's interests.  … CTC was grossly negligent.…"  Spencer opinion dated April 17, 2006, p. 14, 15.  These and other similar legal matters led to a reduction in CTC's capitalization below the $1 million threshold and led to the Pennsylvania Department of Banking's decision to place CTC under a Memorandum of Understanding.  Costs and expenses from this legal matter led to the reduction in capitalization of CTC.

93.    In response to a request for lawsuit information, CFI provided a litany of cases filed against the company, including the Matter of the Gabriella Ami Eisen Special Needs Trust Dated January 9, 1998.  It is believed that Gabriella Ami Eisen, who was born with serious birth defects, received money as a result of litigation stemming from the nuclear reactor incident in 1979 known for the location of the power plant at Three Mile Island.  The money was placed at CTC to be held in a special needs trust for the benefit of Gabriella Eisen.  When Gabriella Eisen was institutionalized, her mother was no longer eligible to continue to receive payments for Gabriella's care.  It is believed and therefore averred that at or around 2000 or 2001, Defendant Gates authorized distribution from the trust for Gabriella's mother, contrary to the intent of the trust, using the mails, telephones, and/or emails, which would constitute mail and/or wire and/or bank fraud, as well as possibly embezzlement of pension and/or welfare funds, or unlawful welfare fund payments.  See 18 U.S.C. §§664, 1341, 1343, 1954.  It is believed that this distribution led to litigation against Defendant Gates and CTC that resulted in a substantial payout to compensate the trust fund for illicit payments under the terms of the trust.  It is believed and therefore averred that this matter was referenced in the CFI 2008 Annual Report proxy as an out-of-court sealed settlement involving payment of $175,000.  Costs and expenses from this legal matter led to the reduction in book value and capitalization of CTC.

94.    Throughout this period, PDB regulators repeatedly charged CTC fees as a result of repeated failures to comply with banking laws and regulations.  The repeated failures led to the fees assessed by PDB to be much higher than they would have been if the defendants were not repeatedly defying regulators.  These PDB regulatory

compliance reviews contributed to the devaluation of CTC. As set forth more fully

above, the individual defendants used intercompany receivables wired to CFI to

camouflage the failure of CFI to maintain required capitalization in violation of 18

U.S.C. §1343.

95.     On September 25, 2005, CTC was held in civil contempt by Judge Mary

McLaughlin of the U.S. District Court for the Eastern District of Pennsylvania for

repeatedly failing to follow the Court's orders directing CTC to produce documents

responsive to a U.S. Department of Labor subpoena, investigating violations of the

Employee Retirement Income Security Act (ERISA). This decision for contempt was

subsequently overturned on a technicality. *Chao v. CTC*, 2005 U.S. Dist. LEXIS 21380

(September 26, 2005). CTC was defended in that litigation by a member of Defendant

Lowell Gates' law firm. According to more recent decisions, Defendant Lowell Gates

was designated as the lead attorney. *See Chao v. Community Trust Company*, 2008

U.S. Dist. 48770 (June 25, 2008) and *Chao v. Community Trust Company*, 2008 U.S.

Dist. 89091 (October 31, 2008). Once again, costs and expenses from this legal matter

led to the reduction in capitalization and directly benefitted Defendant Lowell Gates in

the form of legal fees paid to himself and his law firm, a clear conflict of interest and an

example of self-dealing. It is believed and therefore averred that Defendant Lowell

Gates in conjunction with some or all of the individual defendants utilized the mails

and/or telephone to engage in this predicate act. 18 U.S.C. §§1341, 1343.

96.     When Plaintiff Patricia A. Helm, also a shareholder in CFI, sought to

obtain the addresses of other shareholders in 2007 to investigate the management of

CFI pursuant to 15 Pa.C.S. §1508, she was denied the information until after she filed a

lawsuit.  In his decision to award attorneys' fees to Ms. Helm, the Honorable M.L.

"Skip" Ebert, Jr., of the Court of Common Pleas of Cumberland County determined

that CFI management, including Defendant Russell, also a defendant in the *Helm* case,

acted in "bad faith" and in a "vexatious" manner before awarding attorneys' fees "as a

legal sanction for forcing [Ms. Helm] to litigate to obtain very simple, fundamental

information to which she had a clear legal right."  *Helm v. CFI, et al*., No. 07-2122

(Cumberland County CCP), opinion p. 7.  This refusal to provide Ms. Helm the

information to which she was clearly entitled in contravention of Pennsylvania law

constitutes a predicate act under the RICO statute.  Working with other shareholders,

Plaintiff Helm diligently sought to inform all shareholders that CFI was being

mismanaged and systematically destroyed.  Costs and expenses, including payment of

attorneys' fees, from this legal matter led to the further reduction in book value and

capitalization of CFI.  Because the mails, fax machines, emails and telephones were

used, this is another example of mail and wire fraud in violation of 18 U.S.C. §§1341,

1343.  **Exhibit B.**

97.    In 2006, Defendant Gates exercised 2500 warrants at $20 per share, when

that same year he represented to the Internal Revenue Service that the price per share

was $13.88 as of December 31, 2006.  In doing so, the defendants engaged in tax fraud

using the mail, which constitutes mail fraud in violation of 18 U.S.C. §1341 .

98.    The loan agreement as set forth above, wherein in exchange for a loan of

$200,000, the individual defendants received either repayment with interest or the

ability to convert to stock that led to a windfall of approximately $1 million in violation

of 18 U.S.C. §§891-894.

**Franklin Financial's Involvement**

99.    Defendant Franklin Financial was fully complicit in the conspiracy and the predicate acts, as it engaged in due diligence and thus knew or should have known of this strategy, effectively ratified the previous actions of the individual defendants, and then obtained a company with more than $70 million in assets under management and approximately $500,000 in yearly returns and a $500,000 corporate headquarters for the bargain price of $1.13 million, more than ninety-percent of which went to a fraction of privileged shareholders.  The shareholders receiving the windfall were precisely those who masterminded the scheme, particularly Defendant Lowell Gates and the other individual defendants.

100.    Franklin Financial understood that the individual defendants benefitted to the detriment of the plaintiffs and other non-defendant shareholders.  Franklin Financial was complicit in the scheme to cheat the plaintiffs and other non-defendant shareholders, as evidenced by the fact that it followed through with the acquisition of the company whose book value and capitalization was plummeting.  Franklin Financial's due diligence, and Franklin Financial's clear control of the merger process, before and after the merger date, establishes that Franklin Financial understood and participated in the scheme to cheat the plaintiffs and other non-defendant shareholders. In addition, Franklin Financial clearly controlled all stock options after the merger, and before the notes were converted.  The Proxy Agreement shows, at p. 29, Franklin Financial demanded that CFI agree that it would not authorize additional stock or stock options, or grant similar rights with respect to its capital stock without the express written consent of Franklin Financial.

101.   It is believed and therefore averred that at or about 2004 Franklin Financial became the administrators of the multimillion dollar estate left by the aunt and uncle of Defendant Lowell Gates, which may explain Franklin Financial's willingness to overlook the actions of the individual defendants to diminish the value of CFI in the months leading up to the acquisition of CFI. Upon information and belief, through this personal relationship with Defendant Lowell Gates, up to and including the emergence of Franklin Financial as the sole candidate for the merger with CFI, Franklin Financial was aware, informed, and participated in the scheme to cheat the plaintiffs and non-defendant shareholders.  In addition, according to the Proxy Statement, Franklin Financial was one of only two prospective purchasers of CFI,  and the other was not named.  Upon information and belief, Franklin Financial's previous long-term financial relationship with one of the individual defendants, Lowell Gates, which was not disclosed in the merger documents, constituted a scheme to allow Franklin Financial to profit at the expense of the non-defendant shareholders.

102.   In addition, it is believed and therefore averred that Franklin Financial benefited from assuming the federal long-term corporate tax loss carry-forward by CFI of approximately $300,000 as a result of Franklin Financial's complicity in this scheme to defraud the non-defendant shareholders, including the plaintiffs.

103.   Defendant Franklin Financial participated fully in the conspiracy, and never objected as CFI was allowed to be devalued.  Defendant Lowell Gates and the individual defendants, as co-conspirators with Franklin Financial, profited greatly from their illicit conduct, including, inter alia, unjust enrichment, conversion, fraud, and breach of fiduciary duty set forth above, and divided more than $1,050,000 among

themselves alone at the final sale of CFI.  Their profits are even more shocking when

compared to the losses to the non-defendant shareholders who did not have insider

knowledge of and participation in the scheme.

104.   The remaining non-defendant shareholders, approximately sixty-two (62)

in all, divided the remaining proceeds of the sale of CFI, amounting to approximately

$75,000 for individual investments of hundreds of thousands of dollars.

105.   Defendant Franklin Financial, which profited by obtaining ownership in

CFI, a company with more than $70 million in assets under management and a

$500,000 corporate headquarters for approximately $1.13 million, never objected to the

individual defendants' destruction of CFI assets leading up to the final transaction and

indeed conspired with the other individual defendants to ensure that Franklin Financial

would achieve ownership of CFI at a bargain basement price of $1.13 million.

106.   Franklin Financial fully joined the unholy alliance, never objected as

CFI's value was diminished because of the sweetheart deal it received in the purchase

of CFI, profited from CFI devaluation, and was thus complicit in this scheme.  Profiting

in the destruction of a business is the essence of the theory of "Creative Destruction"

adopted by Defendant Lowell Gates and the other Individual Defendants in the

mismanagement of CFI.

107.   Defendant Gates' enterprise to defraud the plaintiffs and other non-

defendant shareholders was accomplished by engaging in "racketeering activity" as set

forth above and defined by the RICO statute at 18 U.S.C. §1961(1) to include the

following:

a.  Mail Fraud (18 U.S.C. §1341) – Defendants, for the purpose of executing their scheme to defraud and obtain money by false and fraudulent purposes, representations and promises placed in the mail, post office, or other authorized depository for mail, matter to be delivered by the U.S. Postal Service and took or received therefrom items such as letters to shareholders, the proxy statement, annual reports of CFI, and other such documents used to further their illicit enterprise to defraud the plaintiffs and other non-defendant shareholders.  To wit, the defendants utilized the U.S. Mail Service over several years to further their scheme of "Creative Destruction" designed to devalue and dilute shareholder equity so that the value of CFI would be greatly reduced on the day of the "change of control" to Franklin Financial.  Franklin Financial utilized the U.S. Mail over at least one year as part of its due diligence before entering into a merger agreement with CFI, and in connection with the change of control of CFI.  Franklin Financial further utilized the U.S. Mail in its communications with one or more of the individual defendants in connection with the eventual purpose of purchasing CFI, since at least 2004 and up to and after the merger, including but not limited to Defendant Lowell Gates.

b.  Wire Fraud (18 U.S.C. §1343) – Defendants for the purpose of executing their scheme to defraud and obtain money by false and fraudulent purposes, representations and promises used the telephone, facsimile machine, electronic mail, or other wire communication device to further

their illicit enterprise to defraud the plaintiffs and other non-defendant shareholders. To wit, the defendants utilized wire communications over several years to further their scheme of "Creative Destruction" designed to devalue and dilute shareholder equity so that the value of CFI would be greatly reduced on the day of the "change of control" to Franklin Financial. Franklin Financial utilized the telephone, facsimile machine, electronic mail, or other wire communication device as part of its solicitation of CFI, and due diligence before entering into a merger agreement with CFI, and in connection with the change of control of CFI. Franklin Financial utilized the telephone, facsimile machine, electronic mail, or other wire communication device in its communications with one or more of the individual defendants in connection with the eventual purpose of purchasing CFI, since approximately 2004 up to and after the merger, including but not limited to Defendant Lowell Gates.

108. Defendants used the U.S. Mail, telephones, facsimile machines, electronic mail, and other such communication devices to engage in the following unlawful activity:

a. The scheme to defraud plaintiffs and other non-defendant shareholders by diluting the value of stock in CFI at the last minute before the purchase by Franklin Financial to reap obscene and illicit profit at the expense of plaintiffs and other non-defendant shareholders who were bona fide purchasers in good faith, as set forth above.

b.   The refusal to provide the names and addresses of other non-defendant

shareholders in violation of 15 Pa.C.S. §1508, as set forth in the legal

opinion of the Honorable M.L. Ebert, Judge, Court of Common Pleas of

Cumberland County, in the *Helm v. CFI*, et al. No. 07-2122, which is

attached as Exhibit B.

c.   The scheme by Defendant Lowell Gates to personally benefit from use of

the corporate assets and goodwill of CTC and CFI, which depleted the

assets of CTC by subjecting to litigation for mistakes, malpractice,

malfeasance and conflict of interest perpetrated by Defendant Gates and

involving CTC, as set forth above.

d.   Defendant Lowell Gates and other defendants directing Mary Solenberger

in an inappropriate and self-serving manner to take distribution of her IRA

so that the proceeds could be placed in a CTC trust to expand its assets

under management, rather than benefit the client, as set forth above.

e.   Defendant Lowell Gates and other defendants illicitly advising Marie

Magaro to divest money from an IRA in contravention of the requirements

of the Internal Revenue Code and then seeking to cover up the same.

f.   Illicitly allowing money intended to be held in trust for the benefit of a

severely disabled child to be used for purposes contrary to the trust leading

to a significant settlement to the trust, as set forth above.

g.   Engaging in violations of Employee Retirement Income Security Act

(ERISA), as set forth above.

109.   Plaintiffs demand a jury trial.

COUNT I
RACKETEER INFLUENCE AND CORRUPT ORGANIZATIONS ACT (RICO)
Section 1962(c)
Plaintiffs v. All Defendants

110.   Paragraphs 1 through 109 are incorporated herein by reference as if set forth in full.

111.   The defendants formed an enterprise for the purpose of defrauding plaintiffs and other non-defendant shareholders and their actions affected interstate commerce.  The defendants are associated by the aforementioned scheme to engage in "Creative Destruction" and by their management and control of CFI's affairs by way of their membership on the board of directors, their position as officer, by their position as corporate legal counsel, and by Franklin Financial's complicity and control in the devaluation of corporate assets without objection after agreeing to the sale price of CFI, including controlling the entire transaction after the merger was approved by the shareholders, which resulted in direct damage to each of the plaintiffs herein.

112.   The defendants engaged in at least two predicate acts for a racketeering offense including mail fraud, wire fraud, tax fraud, and bank fraud, as set forth above.

113.   The defendants intentionally misrepresented the value of CFI to non-defendant shareholders, including the plaintiffs.

114.   The defendants knowingly participated in and furthered the  scheme through numerous acts of mail, wire, tax and banking fraud.  Specifically, defendants, having devised a scheme or artifice to defraud, or for obtaining money or other property by means of false or fraudulent pretenses, representations or promises, for the purpose

of executing such scheme or artifice or attempting to do so, placed in a post office or other authorized depository for mail, the numerous letters, packages or other items to be sent or delivered by U.S. Postal Service, or by private or commercial interstate carrier, including, but not limited to, each CFI Annual Report, the Proxy Statements of Franklin Financial, letters to shareholders, and requests for additional capitalization. Franklin Financial engaged in mail correspondence with the individual defendants involving each of the predicate acts, and as part of the scheme to defraud the plaintiffs.

115.   The acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. §1962(c).

116.   The defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering activity described in more detail above, in violation of 18 U.S.C. §1962(c). This scheme could not have occurred without the participation of the individual defendants and Franklin Financial, which was complicit in the efforts to diminish the value of CFI so more stock could be obtained by the defendants at a lower value and thus dilute the value of the plaintiffs' and other shareholders' shares and increase the portion of CFI's sale price provided to the individual defendants. Franklin Financial controlled and dictated the actions of CFI, and influenced the acts of the individual defendants, leading up to the merger, and participated fully in the pattern of racketeering activity, by conducting due diligence, and requiring that all actions taken by CFI and the individual defendants leading up to the change of control be authorized in writing by Franklin Financial, as set forth in the Proxy Statement.

117.    As a direct and proximate result of defendants' racketeering activities and violations of 18 U.S.C. §1962(c) described above, the plaintiffs have been injured in an amount equal to at least their individual investments in CFI and its predecessor companies that defendants converted as well as the profits, if any, distributed to the defendants in connection with the illicit scheme set forth above.

118.    In addition, as a direct and proximate result of defendants' racketeering activities and violations of 18 U.S.C. §1962 described above, plaintiffs in their individual capacities have been injured in their business and property in an amount equal to at least their investment as well as any profits derived therefrom.

119.    The defendants conspired to engage in said racketeering activities set forth above.

120.    The defendants invested income derived from said racketeering activities, acquired control in CFI through a pattern of racketeering activity, conducted the affairs of CFI through a pattern of racketeering activity, and conspired to do all of the above.

WHEREFORE, plaintiffs respectfully request that the Court enter judgment in their favor and against the defendants as follows:

    a.    Order defendants to return plaintiffs' investment and any profit derived therefrom to the plaintiffs;

    b.    Award each plaintiffs compensatory damages in an amount to be determined at trial totaling more than $80,000 for each plaintiff;

    c.    Award each plaintiff treble damages;

    d.    Award plaintiffs their attorneys' fees and costs, and

e.   Award such other and further relief as the Court deems just and proper.

COUNT II

RICO §1962(b)
Plaintiffs v. All Defendants

121.   Paragraphs 1 through 120 are incorporated herein by reference as if set forth in full.

122.   CFI was an enterprise whose activities affected interstate commerce.

123.   Defendants acquired and maintained interests in and control of the enterprise through a pattern of racketeering activity described in more detail above, including Franklin Financial's acquisition of CFI – a company with more than $70 million in assets under management and a corporate headquarters valued at $500,000 -- for approximately $1.13 million as well as payment to the defendants of more than $1 million and distribution to the plaintiffs and the other more than 60 non-defendant shareholders, of approximately $75,000 of the sale price of CFI.

124.   The racketeering activity described above constitutes a pattern of racketeering activity pursuant to 18 U.S.C. §1961(5).

125.   Defendants have directly and indirectly acquired and maintained interests in and control of CFI through the pattern of racketeering activity described above, in violation of 18 U.S.C. §1962(b).

126.   As a direct and proximate result of the defendants' racketeering activities and violations of 18 U.S.C. §1962(b), the plaintiffs have been injured in their business and property in an amount equal to their investment, any profits derived therefrom, and the decreased value of CFI.

WHEREFORE, plaintiffs respectfully request that the Court enter judgment in their favor and against the defendants as follows:

a.   Order defendants to return plaintiffs' investment and any profit derived therefrom to them;

b.   Order defendants to restore the value of CFI as a result of defendants' diluting and devaluing the value of CFI;

c.   Award the plaintiffs compensatory damages in an amount to be determined at trial, totaling more than $80,000 for each plaintiff;

d.   Award each plaintiff treble damages;

e.   Award plaintiffs their attorneys' fees and costs, and

f.   Award such other and further relief as the Court deems just and proper.

COUNT III
RICO §1962(D)
Plaintiffs v. All Defendants

127.   Paragraphs 1 through 126 are incorporated herein by reference as if set forth in full.

128.   As set forth above, defendants agreed and conspired to violate 18 U.S.C. §§1962(b) and (c).

129.   The defendants have intentionally conspired and agreed to acquire and maintain interests in and control of an interstate enterprise through a pattern of racketeering activity.

130.    The defendants have intentionally conspired and agreed to conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity.

131.    The defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.  Even Franklin Financial, which may have joined the conspiracy later than others, engaged in due diligence prior to the purchase and thus was keenly aware of the various predicate acts and by choosing to enter into the merger agreement effectively ratified such acts for the purposes of establishing a conspiracy as set forth herein.  Franklin Financial was aware of and was part of the conspiracy to engage in the the devaluation of the shares of CFI as well as the dilution scheme to benefit the individual defendant shareholders as well as Franklin Financial, by effecting the sale of CFI at a relatively cheap price.  In addition, Franklin Financial had a previous relationship with at least one of the individual defendants, Lowell Gates, and, according to the Proxy Statement, Franklin Financial was only one of two alleged prospective purchasers, and as the alleged other purchaser was not named, it is alleged upon information and belief, that Franklin Financial conspired with the individual defendants even before the proposed merger. The defendants' conduct constitutes a conspiracy to violate 18 U.S.C. §§1962(b) and (c), in violation of 18 U.S.C. §1962(d).

132.    As a direct and proximate result of defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and in violation of 18 U.S.C. §1962(d), the plaintiffs have been injured in their business and property in an amount equal to their

41

investment, any profits derived therefrom, and the decreased value of CFI in the years preceding the purchase by Franklin Financial.

133. The defendants obtained or caused to be obtained or transferred shares in CFI using false or fraudulent information, including insider information.

134. The defendants engaged in deceptive business practices that caused the plaintiffs and other non-defendant shareholders to acquire shares in CFI without knowing the true value of their investment and without foreseeing defendants' scheme to devalue and dilute shares at the last minute to benefit substantially from said illicit scheme set forth above.

135. In furtherance of said deception, the defendants made or caused to be made false or misleading statements on financial reports and other such documents.

136. As a result of said deceptions, investors including the plaintiffs lost money.

WHEREFORE, plaintiffs respectfully request that the Court enter judgment in their favor and against the defendants as follows:

    a. Order defendants to return plaintiffs' investment and any profit derived therefrom;

    b. Order defendants to restore the value of CFI as a result of defendants' diluting and devaluing the value of CFI;

    c. Award each plaintiffs compensatory damages in an amount to be determined at trial which totals more than $80,000 for each plaintiff;

    d. Award each plaintiff treble damages;

e.   Award plaintiffs their attorneys' fees and costs, and

f.   Award such other and further relief as the Court deems just and proper.

COUNT IV
CONVERSION/UNJUST ENRICHMENT

Plaintiffs v. All Defendants

137.   Paragraphs 1 through 136 are incorporated herein by reference as if set forth in full.

138.   The defendants acquired possession and control over the property of the other non-defendant shareholders, including the property of the plaintiffs, and interfered with that property, through an elaborate and premeditated scheme to ensure that the defendants benefitted financially from the purchase of CFI by Franklin Financial to the financial detriment of the plaintiffs and the other non-defendant shareholders, and was made without the consent of the plaintiffs and non-defendant shareholders and without lawful justification.

139.   The plaintiffs were the rightful and legal owner over substantially more of CFI than was reflected in the money they received as a result of CFI's sale to Franklin Financial.

140.   The defendants received and retained the property of the plaintiffs and other non-defendant shareholders knowing that it rightfully belonged to the non-defendant shareholders, without justification; and, that the defendants were unjustly enriched.

141.   The defendants intentionally obtained and withheld property of the plaintiffs and other non-defendant shareholders by deception.

142.   The defendants created and reinforced a false impression regarding the value of the shares in CFI.

143.   The defendants prevented the plaintiffs and other non-defendant shareholders from acquiring information which would affect their judgment of the merger and their willingness to see the merger consummated.

144.   The plaintiffs and other non-defendant shareholders were intentionally led to believe that they would receive more than $2 per share of CFI when there was a shareholder vote on the sale at or around September 2008.

145.   The defendants, individually and in concert, failed to correct a false impression which they previously created or reinforced, or which they knew to be influencing another to whom they stood in a fiduciary or confidential relationship.

146.   Defendant specifically Franklin Financial controlled the entire merger process, including keeping and holding the share certificates of all plaintiff shareholders, calculating the payout, and controlling all post-merger payments and values, and thereby deprived all plaintiffs of their right in their property, and interfered therefrom without the plaintiff shareholder's consent and without legal justification.

WHEREFORE, plaintiffs respectfully request that the Court enter judgment in their favor and against the defendants, and further:

a.   Order defendants to return plaintiffs' investment and any profit derived therefrom to him;

b.   Order defendants to restore the value of CFI as a result of defendants' diluting and devaluing the value of CFI;

    c.   Award plaintiffs compensatory damages in an amount to be determined totaling more than $80,000 for each plaintiff;

    d.   Award each plaintiffs punitive damages;

    e.   Award plaintiffs pre judgment and post judgment interest on its damages at the maximum legal rate and full extent permitted by law;

    f.   Award plaintiffs exemplary damages;

    g.   Award plaintiffs attorneys fees and costs; and

    h.   Award plaintiffs any such other and further relief as the Court may deem just and proper.

COUNT V
BREACH OF FIDUCIARY DUTY
15 Pa.C.S. §512; 15 Pa.C.S. §1712
Plaintiffs v. Defendants Lowell Gates, Habacivich, Dunphy, Henry, Kohr, and Russell

147.   Paragraphs 1 through 146 are incorporated herein by reference as if set forth in full.

148.   Each of the individual defendants stood in a fiduciary relationship to each of the non-defendant shareholders, including plaintiffs, either as a director, officer, or legal counsel to CFI.

149.   It is believed and therefore averred that the actions of the defendants, including their refusal to resolve the *Helm* litigation short of final adverse judgment by a court of law and an award of attorneys' fees to Plaintiff Patricia Helm (Exhibit B), constituted a breach of their fiduciary duty because the individual defendants acted in bad faith and could not reasonably consider their actions to be in the best interests of the corporation.

150.   As such, the defendants were obligated to act in good faith in the best interests of the corporation to benefit all shareholders, including plaintiffs.

151.   Defendants further did not act in a manner consistent with ordinary prudence under the circumstances.

152.   Pennsylvania Corporations Law sets forth in pertinent part that "[a] director of a domestic corporation shall stand in a fiduciary relation to the corporation and shall perform his duties as a director, . . . in a manner he reasonably believes to be in the best interests of the corporation and with such care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances."  15 Pa.C.S. §§512(a), 1712(a).

153.   The facts as set forth above demonstrate that the Defendants Lowell Gates, Habacivich, Dunphy, Henry and Kohr, who were members of the board of directors of CFI at various times, breached their fiduciary duties to CFI and its other non-defendant shareholders, including the plaintiffs herein, and acted in a manner that could not be reasonably considered in the best interests of the corporation when they engaged in conduct designed to devalue stock to benefit themselves ultimately.

154.   The actions of the aforementioned defendant directors of CFI as set forth more fully above were not in good faith and failed to demonstrate reasonable inquiry, skill, and diligence as a person of ordinary prudence would use under similar circumstances.

155.   Pennsylvania Corporations Law also sets forth in pertinent part that "an officer shall perform [her] duties as an officer in good faith, in a manner [she] reasonably believes to be in the best interests of the corporation and with such care,

including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances." 15 Pa.C.S. §§512(c), 1712(c).

156.    The actions as set forth above demonstrate that Defendant Russell, former President of CFI, were not taken in good faith nor in a manner that could reasonably be considered to be in the best interests of CFI and thus its non-defendant shareholders, including plaintiffs.

157.    In addition, the actions as set forth above demonstrate that Defendant Russell failed to act with such care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would act under similar circumstances to benefit the corporation and thus its non-defendant shareholders, including plaintiffs.

158.    Defendant directors and officer(s) acted in a manner contrary to the best interests of CFI and its non-defendant shareholders, including the plaintiffs, in an effort to benefit themselves and not the company or its non-defendant shareholders, such as plaintiffs.

WHEREFORE, plaintiffs respectfully request that the Court enter judgment in their favor and against these defendants, and further:

a.    Order these defendants to return plaintiffs' investment and any profit derived therefrom to each plaintiffs;

b.    Order these defendants to restore the value of CFI as a result of defendants' diluting and devaluing the value of CFI;

c.    Award each plaintiff compensatory damages in an amount to be determined at trial totaling more than $80,000 for each plaintiff;

    d.   Award each plaintiff punitive damages;

    e.   Award plaintiffs pre judgment and post judgment interest on its damages

        at the maximum legal rate and full extent permitted by law;

    f.   Award plaintiffs exemplary damages;

    g.   Award plaintiffs attorneys fees and costs; and

    h.   Award plaintiffs any such other and further relief as the Court may deem

        just and proper.

COUNT VI
FRAUD/WASTE OF CORPORATE ASSETS
Plaintiffs v. Defendants Lowell Gates, Habacivich, Dunphy, Henry, Kohr, and Russell

159.   Paragraphs 1 through 158 are incorporated herein by reference as if set forth in full

160.   The defendants represented to the non-defendant shareholders, like plaintiffs, that they owned stock with a certain value.

161.   These terms were memorialized in capitalization agreements in 1998 and in 2002 as well as in various annual reports, letters, and other corporate documents.

162.   At the time of such representations, defendants acting in conspiracy knew and planned to take actions before "the closing date of a change in control" to diminish significantly the value of the non-defendant shareholders' investments, such as plaintiffs' investments.

163.   Defendants expended corporate assets in a manner that could not be reasonably considered in the best interests of CFI in an intentional effort to minimize CFI's "book value" so that at the last minute the individual defendants could obtain a

massive amount of stock at a reduced rate and thus dilute the interests of other non-defendant shareholders, including plaintiffs.

164.   The representations regarding the share values made by the defendants, either individually or in concert, were false when made and made with the knowledge of their falsity and the intent to induce non-defendant shareholders to invest in CFI.

165.   The plaintiffs and other non-defendant shareholders acted in reliance of these misrepresentations and suffered injury as a result of the material false representations made by the defendants without being properly compensated.

166.    The aforesaid false representations by the defendants were made intentionally and thereby warrant imposition of exemplary damages against the defendants in addition to any other damages awarded to the plaintiffs.

167.   As set forth more fully above, the individual defendants engaged in an intentional deception made for personal gain or to damage the other non-defendant shareholders, including plaintiffs.

WHEREFORE, plaintiffs respectfully request that the Court enter judgment in their favor and against the defendants, and further:

a.   Order defendants to return plaintiffs' investment and any profit derived therefrom to each plaintiffs;

b.   Order defendants to restore the value of CFI that was lost to plaintiffs as a result of defendants' diluting and devaluing the value of CFI;

c.   Award each plaintiffs compensatory damages in an amount to be determined at trial totaling more than $80,000 for each plaintiff;

    d.   Award each plaintiffs punitive damages;

    e.   Award plaintiffs pre judgment and post judgment interest on his damages at the maximum legal rate and full extent permitted by law;

    f.   Award plaintiffs exemplary damages;

    g.   Award plaintiffs attorneys fees and costs; and

    h.   Award plaintiffs any such other and further relief as the Court may deem just and proper.

COUNT VII
CONSPIRACY

168.   Paragraphs 1 through 167 are incorporated herein by reference as if set forth in full.

169.   The defendants entered into an agreement to commit each of the foregoing violations of law.

170.   Each of the defendants willingly participated in some or more of the actions leading to the claims set forth above

171.   Each of the defendants willingly participated in some or all of the aforementioned offenses.

172.   The defendants engaged in overt acts in furtherance of each of the aforementioned offenses.

WHEREFORE, plaintiffs respectfully request that the Court enter judgment in their favor and against the defendants, and further:

    a.   Order defendants to return plaintiffs' investment and any profit derived therefrom to each plaintiffs;

50

b.  Order defendants to restore the value of CFI as a result of defendants'

diluting and devaluing the value of CFI;

c.  Award each plaintiff compensatory damages in an amount to be

determined at trial totaling more than $80,000 for each

plaintiff;

d.  Award each plaintiff punitive damages;

e.  Award plaintiffs pre judgment and post judgment interest on its damages

at the maximum legal rate and full extent permitted by law;

f.  Award plaintiffs exemplary damages;

g.  Award plaintiffs attorneys fees and costs; and

h.  Award plaintiffs any such other and further relief as the Court may deem

just and proper.

## COUNT VIII
### SUCCESSOR LIABILITY AGAINST FRANKLIN FINANCIAL

173.  Paragraphs 1 through 172 are incorporated herein by reference as if set forth in full.

174.  Franklin Financial acquired CFI and CTC through the terms set forth in the Proxy Agreement.

175.  At page 19 of the Proxy Statement, it is clearly stated that CFI would be merged "with and into" Franklin Financial, and at page 3, it states "with Franklin Financial as the surviving company to that merger."

176.  At page 27 of the Proxy Statement, it is clearly set forth that Franklin Financial will receive all property, rights, powers, duties, obligations, debts and liabilities of CFI and CTC.

177.   According to the Proxy Agreement , Franklin Financial assumed full successor liability to the actions of CFI and CTC, and their officials.

WHEREFORE, plaintiffs respectfully request that the Court enter judgment in their favor and against the defendant Franklin Financial, on the basis of its successor liability, and further:

a.   Order defendant Franklin Financial to return plaintiffs' investment and any profit derived therefrom to each plaintiff;

b.   Order defendant Franklin Financial to restore the value of CFI as a result of defendants' diluting and devaluing the value of CFI;

c.   Award each plaintiff compensatory damages in an amount to be determined at trial totaling more than $80,000 for each plaintiff;

d.   Award each plaintiff punitive damages;

e.   Award plaintiffs pre judgment and post judgment interest on its damages at the maximum legal rate and full extent permitted by law;

f.   Award plaintiffs exemplary damages;

g.   Award plaintiffs attorneys fees and costs; and

h.   Award plaintiffs any such other and further relief as the Court may deem just and proper.

### COUNT IX
### VIOLATION OF UCC AGAINST FRANKLIN FINANCIAL
(13 Pa. C.S. §8501, et. Seq.)

178.   Paragraphs 1 through 177 are incorporated herein by reference as if set forth in full.

179.   After the merger with CFI, Franklin Financial assumed control and responsibility of receiving the share certificates of CFI shareholder non-defendants, in exhange for cash payments.

180.   Upon information and belief, Franklin Financial did not receive value for receipt of the share certificates, and had notice of, and participated in, the scheme and conspiracy of all defendants herein.

181.   Franklin Financial violated the Pennsylvania UCC provisions, including 13 Pa. C.S. § 8501, et seq., and non-defendant plaintiffs herein remained holders of entitlement interests in their CFI share certificates.

182.   Franklin Financial is responsible for compensating non-defendant plaintiffs for the full amount of their entitlement interest in CFI shares which were tendered to Franklin Financial pursuant to the merger.

WHEREFORE, plaintiffs respectfully request that the Court enter judgment in their favor and against the defendant Franklin Financial, on the basis of its successor liability, and further:

a.   Order defendant Franklin Financial to return plaintiffs' investment and any profit derived therefrom to each plaintiffs;

b.   Order defendant Franklin Financial to restore the value of CFI as a result of defendants' diluting and devaluing the value of CFI;

c.   Award each plaintiffs compensatory damages in an amount to be determined at trial totaling more than $80,000 for each plaintiff;

d.   Award each plaintiffs punitive damages;

e.   Award plaintiffs pre judgment and post judgment interest on its damages

at the maximum legal rate and full extent permitted by law;

f.   Award plaintiffs exemplary damages;

g.   Award plaintiffs attorneys fees and costs; and

h.   Award plaintiffs any such other and further relief as the Court may deem

just and proper.

**JURY TRIAL DEMANDED**

Respectfully submitted,

**THE FARNAN LAW OFFICE**

By:   *s/ Michael A. Farnan*
       Michael A. Farnan
       PA ID No. 69158
       mfarnan@farnanlawoffice.com

       3710 Forbes Ave, 3rd Floor
       Pittsburgh, PA 15222
       Tel: (412) 592-7737
       Fax: (412) 202-4383

*Counsel for Plaintiffs*

Dated: September 15, 2010