IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MATTHEW P. AMOS, | : |
|     Plaintiff | : |
| | : |
| vs. | CIVIL NO. 1:CV-10-1285 |
| | : |
| FRANKLIN FINANCIAL SERVICES CORPORATION, et. al, | : |
|     Defendants | : |

*M E M O R A N D U M*

I.  *Introduction*

    Matthew P. Amos and the other twenty-four plaintiffs are former shareholders in Community Financial, Inc. (CFI).  Defendant, Franklin Financial Services Corp. (Franklin Financial) acquired CFI in a merger whereby CFI ceased to exist and its shareholders were paid cash for their shares.  Plaintiffs filed this suit against Franklin Financial and seven individual defendants, mostly shareholders and officers of CFI, alleging that in the years leading up to the merger, the individual defendants operated CFI in a way that diluted the value of the payment to the plaintiff shareholders upon the merger relative to the payments received by the defendant shareholders.

    Plaintiffs have made claims under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-1968, and under state law for conversion, unjust enrichment, breach of fiduciary duty, fraud and waste of corporate assets, conspiracy, and a violation of the Pennsylvania Uniform Commercial Code.

    We are considering two motions to dismiss under Fed. R. Civ. P. 12(b)(6), one filed by Franklin Financial and the other by the individual defendants.  Both motions argue that the RICO claims lack merit because Plaintiffs are basing them on fraud in the

sale of securities and RICO excludes such claims from the reach of the statute.  Since these are the only federal claims, they also argue we should decline to exercise supplemental jurisdiction over the state-law claims and dismiss the entire action.[1]

For the reasons set forth below, we agree with the defendants that the plaintiffs fail to state RICO claims because of the statutory exception for fraud in the sale of securities.  We will also decline to exercise supplemental jurisdiction over the state-law claims.  Hence this action will be dismissed.

II.   *Standard of Review*

In considering a motion to dismiss, "[w]e 'accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'"  *Byers v. Intuit, Inc.*, 600 F.3d 286, 291 (3d Cir. 2010)(quoted case omitted).  The court is not limited to evaluating the complaint alone.  It may consider documents that form the basis of a claim.  *Lum v. Bank of Am.*, 361 F.3d 217, 221 n.3 (3d Cir. 2004).  It may also consider "documents whose contents are alleged in the complaint and whose authenticity no party questions," even though they "are not physically attached to the pleading . . . ."  *Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 560 (3d Cir. 2002).

With this standard in mind, we set forth the background to this case, as the plaintiffs allege it.

III.   *Background*

The plaintiffs allege the following, in pertinent part.  In October 1998, out of a predecessor entity, defendant, Lowell Gates, created Community Trust Company

---

[1] The defendants also argue that the RICO and state-law claims lack merit in any event.

(CTC), a corporation providing trust services regulated by the Pennsylvania Department of Banking. (Am. Compl. ¶¶ 27, 29). The Department of Banking required at least $1 million in capitalization for CTC to maintain its charter. In 2000, at Lowell Gates's direction, CFI was created as a holding company for CTC. (Id. ¶ 30). "CTC became a wholly-owned subsidiary of CFI, which held all of CTC's common stock." (Id. ¶ 31). CFI began "to grow in value as investors placed large sums of money in trust with CTC," its subsidiary. (Id. ¶ 33). In 2002, a second private securities offering was made to recapitalize CFI. This offering indicated that CFI's management, including Gates, would maintain capitalization at the $1 million amount. (Id. ¶ 34).

At some point, "[w]ithout informing plaintiffs, Defendant Lowell Gates plotted a cynical method of enriching himself and the other defendants . . . ." (Id. ¶ 35). He and the other individual defendants, including CFI board members and management, "began to deceive CFI non-defendant shareholders like plaintiffs into believing that . . . Gates and the other defendants were fulfilling their corporate fiduciary responsibilities while actually overseeing the destruction of CFI using a sophisticated scheme." (Id.). The defendants' scheme involved gaining control of the CFI board of directors, in part by ousting plaintiff, Matthew P. Amos, as a board member, (id. ¶ 36), and then engineering "a sure and steady decline in the fortunes of CFI, while falsely representing to non-defendant shareholders, including the plaintiffs, that every effort was being made to make CFI profitable." (Id.).

Among the deceptive practices was the improper use of "intercompany receivables" between CTC and CFI "to artificially inflate stated shareholder equity to misrepresent CTC as complying with the [Banking Department's] capitalization requirements" for the Department's quarterly call reports. (Id. ¶ 40). When plaintiff, Matthew P. Amos, tried to obtain information on the call reports, defendant Russell

refused, using the "shell game" that he was not entitled to the reports because he was not a shareholder in CTC, which had filed the reports. (Id. ¶ 41). In another instance, plaintiff Helm was refused the addresses of other CFI shareholders in 2007, which she wanted to use to investigate CFI's management. (Id. ¶ 96).

As part of the scheme, "Series A Capital Notes" were issued in 2005. By way of these notes, the "individual defendants loaned $200,000 to CFI . . . in exchange for repayment with interest or the ability to convert shares of stock based on the 'book value per share . . . on the closing date of the change in control.'" (Id. ¶ 19)(quoting CFI 2005 Annual report, note 4). CFI's 2007 Annual Report also mentioned the notes:

> During 2005, Community Trust Company, as part of its capital plan, issued non-negotiable Series A Capital Notes to certain directors of the Corporation. Proceeds from the issuance totaled $200,000. The notes bear interest at 6% per annum commencing December 31, 2007. Interest expense of $6,000 was paid on June 30, 2008.
>
> The Notes are unsecured. As an incentive to participate in the issuance, each note holder was issued 250 shares of Community Financial, Inc. stock for every $10,000 lent to the corporation. The Notes also have change in control provisions that allow note holders to convert their notes into Community Financial stock. The number of shares to be issued would be based on the book value per share of the Company on the closing date of a change in control.

(Am. Compl. ¶ 80)(emphasis added in amended complaint).

Sometime before mid-2008, the individual defendants conspired with Franklin Financial to enter into the merger agreement. (Id. ¶ 21).[2] Franklin Financial was to pay $1.13 million for CFI, payable to the shareholders based on the number of shares owned and the book value at the end of the month preceding the merger date. (Am. Compl. ¶ 21 and doc. 20-5, Ex. D, proxy statement, dated Aug. 8, 2008, CM/ECF pp. 1

---

[2] Plaintiffs allege that Franklin Financial's relationship with the individual defendants goes back to 2004, "when Franklin Financial began administering the multi-million dollar estate of the deceased aunt and uncle of Lowell Gates." (Id. ¶ 76).

4

and 35). The proxy statement said that if the merger had taken place on July 1, 2008, the book value of CFI at the end of July 2008 would give a cash value of $2.79 per share. (Am. Compl. ¶ 61 and doc. 20-5, Ex. D, proxy statement, dated Aug. 8, 2008, CM/ECF pp. 1 and 35).

The merger was consummated on November 29, 2008. (Am. Compl. ¶ 67; Ex. C, doc. 20-4, CM/ECF p. 2). CFI's book value on October 31, 2008, was $.15 per share.[3] The individual defendants exercised their right to convert their notes into stock, resulting in the issuance of 1,366,380 new shares. (Am. Compl. ¶ 65). This meant that the total shares owned by the individual defendants came to over 1,470,000 while non-defendant shareholders held only 103,535. (Id.). This "dilution" of the shares held by the latter led to the sixty-two non-defendant shareholders (including the plaintiffs) dividing about $75,000 between them while the seven individual defendants collectively received $1,050,000, (id. ¶¶ 71, 72), even though before the merger the non-defendant shareholders owned a little less than 50% of the company. (Id. ¶ 14).[4]

Plaintiffs allege that to accomplish this result the individual defendants engaged, in part, in fraudulent conduct, that would cause CFI's financial condition to deteriorate, thereby providing an excuse for the merger.[5] They allege that the proxy statement's use of a $2.79 per share book value was a "fraudulent sales technique" that

---

[3] However, the merger agreement's ultimate valuation was $.71 per share. (Am. Compl. ¶ 69).

[4] As the individual defendants point out, however, the proxy statement also said that the individual defendants intended to convert their notes to shares if the merger went through. (Doc. 20-5, Ex. D, proxy statement, dated Aug. 8, 2008, CM/ECF p. 1).

[5] As the individual defendants point out, however, the proxy statement said that the merger was required because the Department of Banking had changed the way the required $1 million capitalization for CFI was calculated. (Doc. 20-5, Ex. D, proxy statement, dated Aug. 8, 2008, CM/ECF pp. 26-27).

5

many non-defendant shareholders relied on to vote for the merger.[6]  (Id. ¶ 61).  They allege that the defendants "intentionally misrepresented the value of CFI to non-defendant shareholders, including the plaintiffs," (id. ¶ 113), and that the dilution of the value of shares was a fraud perpetrated by the individual defendants.  (Id. ¶ 70; ¶ 72 ("scheme to defraud"); ¶¶ 81, 83, 86).  Plaintiffs allege that "CFI was controlled by the individual defendants, who engaged in an enterprise to defraud plaintiffs and other non-defendant shareholders.  The defendants issued additional stock to themselves, who were engaged in this enterprise, that resulted in the dilution of book value per share of CFI common stock."  (Id. ¶ 79).  The defendants "devised a scheme or artifice to defraud," (id. ¶ 114), "to diminish the value of CFI so more stock could be obtained by the defendants at a lower value and thus dilute the value of the plaintiffs' and other shareholders' shares and increase the portion of CFI's sale price provided to the individual defendants."  (Id. ¶ 116).  Other predicate acts are alleged.  (Id. ¶ 108). Franklin Financial joined this scheme and benefitted by "obtaining a company with more than $70 million in assets under management, reaping estimated annual returns of $700,000, and a $500,000 corporate headquarters for a mere $1,130,000."  (Id. ¶ 14). The individual defendants intended to benefit either by "substantially cover[ing] their losses or reap[ing] colossal gains . . . ."  (Id. ¶ 35).

>Additional relevant allegations are as follows:

>133.  The defendants obtained or caused to be obtained or transferred shares in CFI using false or fraudulent information, including insider information.

>134.  The defendants engaged in deceptive business practices that caused the plaintiffs and other non-defendant shareholders to acquire shares in CFI without knowing the

---

[6] As the individual defendants point out, however, the proxy statement also said that the book value at the end of June would not necessarily be indicative of the book value for the end of the month before the actual merger date.  (Doc. 20-5, Ex. D, proxy statement, dated Aug. 8, 2008, CM/ECF pp. 1 and 35).

> true value of their investment and without foreseeing
> defendants' scheme to devalue and dilute shares at the last
> minute to benefit substantially from said illicit scheme set forth
> above.
>
>   135.  In furtherance of said deception, the defendants made
> or caused to be made false or misleading statements on
> financial reports and other such documents.
>
>   136.  As a result of said deceptions, investors including the
> plaintiffs lost money.

(Am. Compl. ¶¶ 133-36).  The measure of damages in the prayer for relief in each claim focuses on the injury to the value of the CFI stock the plaintiffs held.

IV.  *Discussion*

The plaintiffs have set forth RICO claims under 18 U.S.C. §§ 1962(b), (c), and (d).  In moving to dismiss the RICO claims, both the individual defendants and Franklin Financial argue that the claims are barred by the statutory prohibition on bringing a RICO claim "actionable as fraud in the purchase or sale of securities . . . ."  18 U.S.C. § 1964(c).[7]  We agree.

Section 1964(c) prohibits a RICO claim "when the conduct pled as predicate offenses is 'actionable' as securities fraud . . . ."  *Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.*, 189 F.3d 321, 330 (3d Cir. 1999).  Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, its implementing regulation, deal with securities fraud.  "To state a valid claim under Rule 10b-5, a plaintiff must show that the defendant 'made a misstatement or an omission of a

---

[7]  Section 1964(c) more fully reads as follows:

> (c) Any person injured in his business or property by reason of
> a violation of section 1962 . . . may sue therefor in any
> appropriate United States district court . . . except that no person
> may rely upon any conduct that would have been actionable as
> fraud in the purchase or sale of securities to establish a violation
> of section 1962.

7

material fact (2) with scienter (3) in connection with the purchase or the sale of a security (4) upon which the plaintiff reasonably relied and (5) that the plaintiff's reliance was the proximate cause of his or her injury.'" *AES Corp. v. Dow Chem. Co.*, 325 F.3d 174, 178 (3d Cir. 2003)(internal quotation marks and quoted case omitted).

As the defendants argue, the plaintiffs' RICO claims are actionable as securities fraud under a Rule 10b-5 analysis. The plaintiffs aver that the individual defendants knowingly made misstatements of material fact relied on by the plaintiffs that injured them by lowering the value of their CFI stock. As noted above, the plaintiffs aver that the defendants misrepresented that they "were fulfilling their corporate fiduciary responsibilities while actually overseeing the destruction of CFI," (Am. Compl. ¶ 35), and engineering "a sure and steady decline in the fortunes of CFI, while falsely representing" to the plaintiffs, "that every effort was being made to make CFI profitable." (Id. ¶ 36). The proxy statement's use of a $2.79 per share book value was a "fraudulent sales technique" that many non-defendant shareholders relied on to vote for the merger. (Id. ¶ 61). The defendants "intentionally misrepresented the value of CFI to non-defendant shareholders, including the plaintiffs," (id. ¶ 113), and the dilution of the value of shares was a fraud perpetrated by the individual defendants. (Id. ¶¶ 70, 72, 79, 81, 83, and 86). The defendants "devised a scheme or artifice to defraud," (id. ¶ 114), to achieve the dilution. (Id. ¶ 116). These misrepresentations were made in connection with the sale of securities as the plaintiffs' agreement to the merger meant that they sold their shares for cash.

In opposing dismissal, the plaintiffs do not challenge the defendants' securities-fraud analysis. Instead, they direct our attention to the 2005 Series A Capital Notes the defendants caused to be issued, the notes that entitled them to additional shares of stock upon change of control. The plaintiffs assert that the statutory exception

for securities-fraud claims does not apply because their claims are based on these notes, and the notes are not securities for the purpose of the exception. They cite in support *Intelligent Digital Sys. LLC v. Visual Mgmt. Sys. Inc.*, 683 F. Supp. 2d 278, 283-84 (S.D.N.Y. 2010), which discusses the legal framework for determining whether a note is a security for the purposes of federal securities law.

We need not determine whether the notes are securities because we reject the argument that the plaintiffs' claims are based on the notes. As detailed above, their claims are based on the alleged scheme to profit from the dilution of the plaintiffs' shares when Franklin Financial bought them at the time of the merger. The issuance of the notes was alleged to be only part of the scheme culminating in the sale of CFI's stock. The securities that are the basis of the RICO claims are thus the shares in CFI, not the notes, and the CFI shares satisfy the RICO exception.

The plaintiffs make two other arguments against application of the statutory exception to dismiss their RICO claims. Citing *Flood v. Makowski*, No. 03-1803, 2004 WL 1908221 (M.D. Pa. Aug. 24, 2004), they contend that "fraud involving securities is actionable under the RICO statute because the victims' claims may fail to give rise to a securities fraud cause of action." (Doc. 45, Pls.' Opp'n Br. at p. 10). They then point to the court's decision in Flood to allow RICO claims to proceed against county retirement board members who were alleged to have awarded contracts to invest or manage pension plan assets in return for campaign contributions, described as a pay-to-play scheme. 2004 WL 1908221, at *1, 17. The securities transactions at issue were performed under the contracts, and involved hidden fees and inappropriately risky investments. Id. at *18. The court decided that the RICO claims against the board members could proceed, reasoning that those claims did not constitute securities fraud because of a failure in the element of causation; "the securities transactions [were] two

transactions removed from any misrepresentations or omissions related to the pay-to-play scheme." Id. at 19. *Flood* is distinguishable because adequate causation was alleged here.

The plaintiffs' second argument is that "where there is direct damage to an individual plaintiff, separate from securities fraud, RICO is available as a remedy." (Doc. 45, Pls.' Opp'n Br. at p. 10). The plaintiffs cite in support *Gintowt v. TL Ventures*, No. 02-746, 2004 WL 1656606 (E.D. Pa. July 22, 2004), where the court allowed the plaintiff's RICO claim based on his ouster as a corporate director to proceed. The plaintiffs point to similar allegations in paragraph 36 of their amended complaint that the defendants' scheme involved gaining control of the CFI board of directors, in part by ousting plaintiff, Matthew P. Amos, as a board member. *Gintowt* is distinguishable. In that case, a separate claim was made for the ouster; here, the ouster of Matthew P. Amos was alleged as part of the plan to dilute the value of the plaintiffs' stock, not as an independent claim.

V. *Conclusion*

Our analysis above leaves no federal claims in the case. The defendants argue that in these circumstances we should decline under 28 U.S.C. § 1367(c)(3) to exercise our supplemental jurisdiction over the state-law claims. We agree, *see Jacobowitz v. M&T Mortgage Corp.*, 372 F. App'x 225, 228-29 (3d Cir. 2010)(per curiam)(nonprecedential), and will dismiss the action, but without prejudice to the plaintiffs' pursuing their state-law claims in state court.

We will issue an appropriate order.

                                /s/William W. Caldwell
                                William W. Caldwell
                                United States District Judge

Date: May 26, 2011

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MATTHEW P. AMOS, : | |
|     Plaintiff : | |
| : | |
| vs. | CIVIL NO. 1:CV-10-1285 |
| : | |
| FRANKLIN FINANCIAL SERVICES : | |
| CORPORATION, et. al, | |
|     Defendants : | |

*O R D E R*

    AND NOW, this 26th day of May, 2011, upon consideration of the defendants' motions (doc. 38 and 39) to dismiss, it is ordered that:

    1. The RICO claims in counts I, II, and III are hereby dismissed.

    2. The court declines to exercise supplemental jurisdiction over the state-law claims in counts IV, V, VI, VII, VIII and IX and those claims are dismissed without prejudice to filing them in state court.

    3. The Clerk of Court shall close this file.

                                                /s/William W. Caldwell
                                               William W. Caldwell
                                               United States District Judge