IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MATTHEW P. AMOS, et al.            :
          Plaintiffs            :
                              :
                              :
                              :   CIVIL NO. 1:CV-10-1285
          vs.            :
                              :
                              :
FRANKLIN FINANCIAL SERVICES    :
CORPORATION, et. al,
              Defendants

*M E M O R A N D U M*

I.   *Introduction and Procedural History*

       Matthew P. Amos and the other twenty-four plaintiffs are former shareholders in Community Financial, Inc. (CFI).  Defendant, Franklin Financial Services Corp. (Franklin Financial), acquired CFI in a merger whereby CFI ceased to exist and its shareholders were paid cash for their shares.  Plaintiffs filed this suit against Franklin Financial and seven individual defendants, mostly shareholders and officers of CFI. Plaintiffs alleged that in the years leading up to the merger, the individual defendants operated CFI in a way that diluted the value of Plaintiffs' shares upon the merger relative to the value of Defendants' shares.  To accomplish this goal, Defendants "devised a scheme or artifice to defraud" and engaged in fraudulent conduct directed at Plaintiffs and other non-defendant shareholders.[1]

       Plaintiffs made claims under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-1968, and under state law for conversion, unjust enrichment, breach of fiduciary duty, fraud and waste of corporate assets, conspiracy, and a violation of the Pennsylvania Uniform Commercial Code.

---

[1]  The total number of shareholders, excluding the individual defendants, was sixty-two. (Am. Compl. ¶ 104).

Two motions to dismiss were filed under Fed. R. Civ. P. 12(b)(6), one by Franklin Financial and the other by the individual defendants.  In part, both motions argued that the RICO claims lacked merit because Plaintiffs were basing them on fraud in the sale of securities (by way of the merger) and RICO excludes from the reach of the statute claims that would be actionable as securities fraud.[2]  We agreed with this argument.  *See Amos v. Franklin Fin. Services Corp.*, 2011 WL 2111991, at *4 (M.D. Pa. May 26, 2011).  Since the RICO claims were the only federal ones, and diversity jurisdiction did not exist, we declined to exercise supplemental jurisdiction over the state-law claims and dismissed the entire action on May 26, 2011.  *Id.*, at *6.

Plaintiffs have filed a motion for reconsideration.  Franklin Financial has filed a brief in opposition and so have the individual defendants.  Plaintiffs argue we erred in concluding that their RICO claims were actionable as a Rule 10b-5 securities-fraud claim.  Plaintiffs contend that because the defendant shareholders controlled the majority of the shares in CFI, and a majority of the shares were all that was needed to accomplish the merger, the merger was a "freeze-out merger."  As a freeze-out merger, it was immaterial whether other shareholders were fraudulently induced into voting for it because the defendants had no need for the votes of other shareholders.  It follows that Plaintiffs have no actionable 10b-5 claim because as a matter of law they could not show the requisite element of causation.

For the reasons set forth below, we agree with Plaintiffs' argument concerning causation and that their motion should be granted.  Thus, we will vacate our previous order.  Nonetheless, for other reasons advanced by Defendants in support of

---

[2]  As noted in our previous memorandum, no one can bring a RICO claim that is actionable as securities fraud.  More specifically, "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a [RICO] violation . . . ."  18 U.S.C. § 1964(c).  Section 1964(c) prohibits a RICO claim "when the conduct pled as predicate offenses is 'actionable' as securities fraud . . . ."  *Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.*, 189 F.3d 321, 330 (3d Cir. 1999).

dismissal of the RICO claims we will enter another order which, once again, dismisses the RICO claims and declines to exercise jurisdiction over the state-law claims.[3]

II.   *Plaintiffs Are Entitled to Reconsideration of the May 26, 2011, Order As It Was Based on a Clear Error of Law*

The May 26, 2011, order dismissing the action was final because it left nothing more to be done by this court.  *See Dotzel v. Ashbridge*, 438 F.3d 320, 323 (3d Cir. 2006).  Plaintiffs' motion for reconsideration challenges the legal correctness of that order.  The motion is therefore treated as one under Fed. R. Civ. P. 59(e) to alter or amend the judgment.  *Holland v. Holt*, 409 F. App'x 494, 496 (3d Cir. 2010)(per curiam)(nonprecedential).  A motion for reconsideration under Rule 59(e) is used "'to correct manifest errors of law or fact or to present newly discovered evidence.'"  *Lazaridis v. Wehmer*, 591 F.3d 666, 669 (3d Cir. 2010)(quoting *Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999)).  "A proper Rule 59(e) motion therefore must rely on one of three grounds: (1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice."  *Id.*

"A motion for reconsideration may not be used as a means to argue new facts or issues that were not presented to the court in the context of the matter previously decided."  *Worbetz v. Ward North America, Inc.*, 54 F. App'x 526, 533 (3d Cir. 2002) (nonprecedential).  It cannot be used to raise new legal issues.  *United States v. Metropolitan St. Louis Sewer Dist.*, 440 F.3d 930, 933 (8th Cir. 2006)(quoted case and internal quotation marks omitted).  Nor can it be used to reargue issues that the court has already considered and disposed of.  *Blanchard v. Gallick*, No. 09-1875, 2011 WL

---

[3]  Our discussion below will assume familiarity with our previous memorandum.

1878226, at *1 (M.D. Pa. May 17, 2011)(Caldwell, J.)(citing *Ogden v. Keystone Residence*, 226 F. Supp. 2d 588, 606 (M.D. Pa. 2002)).

In opposing the motion, Defendants first argue that it is untimely because Local Rule 7.10 requires that motions for reconsideration be "filed within fourteen (14) days after the entry of the order concerned" and Plaintiffs filed the motion on June 13, 2011, eighteen days after May 26, 2011, the date of the order.  We reject this argument. Local Rule 7.10 specifically excludes from its scope a motion to alter or amend under Fed. R. Civ. P. 59, and as noted above, Plaintiffs' reconsideration  motion is governed by Fed. R. Civ. P. 59(e).[4]  Rule 59(e) allows a party twenty-eight days from the entry of the order to file a motion to alter or amend.  Plaintiffs' motion for reconsideration was therefore timely as the Rule 59(e) deadline expired on June 23, 2011, and Plaintiffs' motion was filed on June 13, 2011, ten days before.

Defendants next argue that the motion must be denied because the argument raised in the motion was not presented in opposing the motions to dismiss.  As noted above, a reconsideration motion cannot be used to argue legal issues not presented in connection with the proceedings leading to the challenged order.

Defendants correctly point out that Plaintiffs' argument is new.  In opposing dismissal, Plaintiffs never said that the merger was a freeze-out merger,[5] nor did they cite

---

[4]    Local Rule 7.10, as amended on December 1, 2010, reads as follows:

> Any motion for reconsideration or reargument must be accompanied by a supporting brief and filed within fourteen (14) days after the entry of the order concerned.  This rule is not applicable to a motion to alter or amend a judgment under Fed. R. Civ. P. 59.

[5]    The merger may not be a freeze-out merger as that term is commonly understood since under the terms of the merger both majority and minority shareholders were cashed out, with CFI becoming a wholly-owned subsidiary of Franklin Financial.  This does not affect Plaintiffs' argument because, no matter how the merger is characterized, the relevant point is that the majority shareholders did not need the votes of the minority shareholders.

in support of the argument *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991), and *Scattergood v. Perelman*, 945 F.2d 618 (3d Cir. 1991), the two cases they cite now in support of their no-causation argument.[6]  It is also true that, generally, new arguments cannot be considered on a motion for reconsideration under Rule 59(e).  This general principle, however, does not apply to clear errors of law or fact.  For example, in *Max's Seafood Café ex rel. Lou-Ann, Inc.*, *supra*, while the Third Circuit recognized that courts take a "'dim view of issues raised for the first time in post-judgment motions,'" 176 F.2d at 678 (quoted case omitted), the court nonetheless decided that the district court had abused its discretion in refusing to consider a factual argument first raised by the corporate defendant on a motion to alter or amend.  The district court had held the corporate defendant in contempt of a consent decree.  The new argument was that the corporation had not come into existence until after the statements in violation of the consent decree at issue had been made.  The court of appeals ruled that this factual issue was "so fundamental," *id.*, that it should have been considered on reconsideration, noting that "reconsideration is the appropriate means of bringing to the court's attention manifest errors of fact or law." *Id.* (citing *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir. 1985)).  *See also In re: Linerboard Antitrust Litig.*, 361 F. App'x 392, 397 n.2 (3d Cir. 2010)(nonprecedential)(district court properly granted reconsideration to correct the court's error of law in vacating an injunction on the mistaken belief that the court would lose jurisdiction after the end of the underlying class action).

In light of *Virginia Bankshares* and *Scattergood*, we believe we made a clear error of law, even though that error resulted from Plaintiffs' failure to present us with the argument at the time Defendants moved to dismiss.  In *Virginia Bankshares*, the

---

[6]     *Scattergood* was cited, but for an issue of state law.

Supreme Court held that shareholders whose votes were not needed either by law or by corporate bylaw to authorize a merger could not bring a section 14(a) securities-fraud claim for misrepresentations in a proxy statement issued in connection with the merger. The Court ruled that the shareholders could not show the necessary causation.  501 U.S. at 1087, 111 S.Ct. at 2755.  In *Scattergood*, the Third Circuit followed Virginia Bankshares in ruling that, without more, shareholders whose votes were not needed for the freeze-out merger could not show causation for both a section 14(a) claim and a Rule 10b-5 claim.  945 F.2d at 625-26.

Application of *Virginia Bankshares* and *Scattergood* is clear and straightforward.  Plaintiffs draw our attention to the allegations of their amended complaint.  They allege that defendant Gates exercised warrants in December 2006 which had the effect of giving the defendant shareholders ownership or control of 50.36% shares, giving them "voting control of the company," (Am. Compl. ¶ 56), and, as of September 2007, "enabling them to control the direction of the company, including effectuating the merger with Franklin Financial and ensuring the demise of CFI."  (*Id.* ¶ 57).  As Plaintiffs argue, since these allegations mean that Defendants had no need for minority shareholders to vote for the merger, our conclusion that Plaintiffs had an actionable Rule 10b-5 securities-fraud claim was mistaken.  Since our conclusion was also contrary to direct and controlling Supreme Court precedent, we must grant the motion for reconsideration to correct this clear error of law.

In opposing the reconsideration motion, the individual defendants and Franklin Financial argue that the amended complaint does not show that a freeze-out merger occurred.  They contend the above allegations only establish that the defendants owned a controlling number of shares in December 2006 and September 2007, and that the amended complaint is silent on the number they owned on August 8, 2008, the record

date for being able to vote on the merger.[7]  We reject this argument.  Viewing the allegations in the light most favorable to Plaintiffs, a reasonable inference is that the defendants not only acquired the majority of the shares but maintained their majority control at all relevant times; paragraph 57 identifies a point in time but also alleges the majority control in existence at that time enabled the defendants to "effectuat[e] the merger with Franklin Financial and ensur[e] the demise of CFI."

Additionally, the individual defendants argue that the allegations fail to show that the merger was a freeze-out merger because the proxy statement stated that CFI's directors and officers owned 91,036 shares and that this was about 43.65% of the shares, (Am. Compl., Ex. D, CM/ECF p. 24), making the votes of the minority shareholders critical to the merger.  We reject this argument.  It ignores defendant Habacivich's 14,000 shares.  The defendants are not all alleged to be directors at the time of the merger.  Plaintiffs allege they were directors at various times.  (Am. Compl. ¶ 13).  Habacivich's shares gives the individual defendants the 50.36% control alleged in paragraphs 56 and 57.  These defendants cite no authority for their proposition that a freeze-out merger occurs only when the officers and directors of a corporation own enough stock to control a merger vote.  The crucial allegation is that while neither Habacivich nor Linda Lee Gates were officers or directors at the time of the merger, they had agreed with the remaining defendants to vote for the merger, thereby rendering the votes of the nondefendant shareholders irrelevant.

Having decided to grant reconsideration, we turn to Defendants' argument that there is still an actionable securities-fraud claim even though Defendants did not need minority shareholder votes to effect the merger.  They contend that for the RICO

---

[7]    Am. Compl., Ex. D, Proxy Statement, CM/ECF p. 24.  (The page number refers to the page number assigned by the Case Management/Electronic Case Files (CM/ECF) system.)

bar to apply they need not show that Plaintiffs themselves have an actionable securities-fraud claim, only that the conduct upon which they base their claim is actionable as securities fraud.  They cite in support *MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 651 F.3d 268, 277-78 (2d Cir. 2011); and *Gatz v. Ponsoldt*, 297 F. Supp. 2d 719, 730 (D. Del. 2003)(RICO exclusion applies "regardless of whether a particular plaintiff has standing to bring a civil action under § 10b or Rule 10b-5").  Defendants assert that even if Plaintiffs have no securities-fraud claim, the non-defendant shareholders who voted for the merger based on the alleged misrepresentations do, and that the existence of the latter claim bars the RICO claims.

In making the argument, Defendants point to the allegations in the amended complaint that "[m]any non-defendant shareholders voted to approve the sale of CFI" based on the proxy statement's estimate that shareholders would have received $2.79 per share if the merger had occurred on July 1, 2008,  Am. Compl. ¶ 61), and that this was a "'classic bait and switch' fraudulent sales technique." (*Id.*).[8]  Defendants argue that these allegations support an actionable securities-fraud claim because the shareholders who voted for the merger lost their right to a state appraisal remedy by voting for the merger.  The loss of this right supplies the causation element missing in the freeze-out mergers presented in *Virginia Bankshares* and *Scattergood*.  Defendants cite in support *Wilson v. Great Am. Indus., Inc.*, 979 F.2d 924, 931 (2d Cir. 1992)(minority shareholders in a freeze-out merger can establish loss causation for a securities-fraud

---

[8]  Franklin Financial was to pay $1.13 million for CFI, payable to the shareholders based on the number of shares owned and the book value at the end of the month preceding the merger date.  (Am. Compl. ¶ 21 and doc. 20-5, Ex. D, proxy statement, dated Aug. 8, 2008, CM/ECF pp. 1 and 35).  The proxy statement said that if the merger had taken place on July 1, 2008, the book value of CFI at the end of July 2008 would give a cash value of $2.79 per share.  (Am. Compl. ¶ 61 and doc. 20-5, Ex. D, proxy statement, dated Aug. 8, 2008, CM/ECF pp. 1 and 35).  The merger was consummated on November 29, 2008.  (Am. Compl. ¶ 67; Ex. C, doc. 20-4, CM/ECF p. 2).  CFI's book value on October 31, 2008, was $.15 per share.  However, the merger agreement's ultimate valuation was $.71 per share.  (Am. Compl. ¶ 69).

claim if they voted for the merger and lost state appraisal rights as a result); and *Howing Co. v. Nationwide Corp.*, 972 F.2d 700, 707-09 (6th Cir. 1992)(same).

We agree with Defendants, and the cases cited, that Defendants need not show that the plaintiffs in this action have an actionable securities-fraud claim as long as Defendants show that the conduct upon which Plaintiffs base their RICO claims is actionable as a securities fraud claim.  Hence Defendants could rely on a securities fraud-claim that could have been brought by others, shareholders who are neither plaintiff nor defendant.  We also accept that these other shareholders could show causation by loss of a state appraisal remedy.  However, we are not convinced that the allegations of the amended complaint show that these shareholders have an actionable claim, and we will therefore not dismiss the RICO claims on the basis of the RICO exclusion for securities fraud claims.

As Plaintiffs point out, *Wilson* is distinguishable because under New York law appraisal was the exclusive remedy and by voting for the merger shareholders lost the only remedy under state law that would have given them fair value for their stock.  *In In re Digital Island Sec. Litig.*, 223 F. Supp. 2d 546, 559 (D. Del. 2002), the court distinguished *Wilson* on this basis in concluding there was no securities-fraud claim in that case because Delaware allowed shareholders to file an equitable action as well. Hence there was no injury.

Similarly, Pennsylvania has an appraisal remedy for minority shareholders, but it may not be the exclusive remedy.  It may be that shareholders may also bring a claim, as Plaintiffs have here, for damages for breach of the majority shareholders' fiduciary duty in connection with a freeze-out merger.  *See Mitchell Partners, L.P. v. Irex Corp.*, 656 F.3d 201, 216 (3d Cir. 2011), *panel rehearing granted*, __ F.3d __, 2011 WL 4448604 (3d Cir. 2011)(question of exclusiveness of appraisal remedy certified to the Pennsylvania Supreme Court).

But we do not base our decision solely on the fact that the appraisal remedy is, or may not be, exclusive.  Franklin Financial argues that it is irrelevant whether the remedy was exclusive or not; the shareholders still lost a remedy.  We disagree.  We think to show that the RICO exclusion applies, Defendants had to show that the appraisal remedy had some distinct advantage that was lost when the minority shareholders voted for the merger.  We base this requirement on *Wilson*'s rationale for accepting the loss of a state remedy to show the necessary causal link; the loss of a state remedy satisfies the element of loss causation for a securities-fraud claim, that is, the requirement of showing economic harm.  *Wilson*, 979 F.2d at 931.  Defendants have not shown that Plaintiffs would suffer economic harm by pursuing other state remedies.  In this regard, we note that in *Howing Co.* the Sixth Circuit observed that the appraisal remedy "would have been more attractive," 972 F.2d at 710, if the proxy statement had provided the required information, basically concluding that the appraisal remedy had some advantage.

In the absence of injury, there does not appear to be a securities-fraud claim.[9]  Since we have decided that Defendants have failed to show that the RICO exclusion applies, we will address the other arguments they made against the RICO claims, presented in their motions to dismiss.

III.  *Standard of Review*

In considering a motion to dismiss, "[w]e 'accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to

---

[9]     Based on this conclusion, we need not address Plaintiffs' other argument for reconsideration, that we erred in concluding that the fraud involved the purchase or sale of CFI's stock, rather than just the 2005 notes.  In any event, this argument cannot be considered on reconsideration because it is simply a repeat of an argument we rejected earlier. Moreover, our earlier ruling remains correct.

relief.'" *Byers v. Intuit, Inc.*, 600 F.3d 286, 291 (3d Cir. 2010)(quoted case omitted).  The court is not limited to evaluating the complaint alone.  It may consider documents that form the basis of a claim.  *Lum v. Bank of America*, 361 F.3d 217, 221 n.3 (3d Cir. 2004).  It may also consider "documents whose contents are alleged in the complaint and whose authenticity no party questions," even though they "are not physically attached to the pleading . . . ."  *Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 560 (3d Cir. 2002).

A complaint has to plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 1974, 167 L.Ed.2d. 929 (2007).  Detailed factual allegations are not required, *id.* at 555, 127 S.Ct. at 1964; *Pryor*, *supra,* 288 F.3d at 564, only a "short and plain statement" showing the right to relief.  *Pryor*, *supra,* 288 F.3d at 564 (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) and quoting Fed. R. Civ. P. 8(a)(2)).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, __, 129 S.Ct. 1937, 1949 (2009)(quoting *Twombly*, 550 U.S. at 556, 127 S.Ct. at 1965). "[M]ore than labels and conclusions" are required.  *Twombly,* 550 U.S. at 555, 127 S.Ct. at 1964-65.  In addition, allegations of fraud must be pled with particularity.  *Lum*, *supra*, 361 F.3d at 223.[10]

IV.   *The RICO Claims Lack Merit*

A.   *Plaintiffs Fail to Show Proximate Cause Because the Injury
Alleged Is Derivative of Injury to CFI, Not a Direct Injury to Plaintiffs*

A RICO claim requires a plaintiff to show proximate cause; "but for" causation is not enough.  *Anza v. Ideal Steel Supply Co.*, 547 U.S. 451, 456-57, 126

---

[10]   Plaintiffs have filed a RICO case statement, but that statement adds nothing to the allegations of the amended complaint.  We therefore look solely to the amended complaint to evaluate the motions to dismiss.

S.Ct. 1991, 1996, 164 L.Ed.2d 720 (2006).  There must be "'some direct relationship between the injury asserted and the injurious conduct alleged.'"  *Id.*, 126 S.Ct. at 1996 (quoting *Holmes v. Securities Investor Prot. Corp.*, 503 U.S. 258, 268, 112 S.Ct. 1311, 1318, 117 L.Ed.2d 532 (1992)).  "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries."  *Id.* at 461, 126 S.Ct. at 1998.

Based on the requirement that a direct relationship be shown, shareholder RICO claims based on injuries to the corporation fail for lack of causation.  The claim belongs to the corporation, and any injury to the shareholder, flowing only indirectly from the injury to the corporation, has no proximate causal relationship to the defendant's conduct.  *See Bixler v. Foster*, 596 F.3d 751, 757, 758-59 (10th Cir. 2010)(collecting case); *Penn Mont Securities v. Frucher*, 502 F. Supp. 2d 443, 466-67 (E.D. Pa. 2007)("Indirect or derivative harms to a shareholder plaintiff do not confer RICO standing."); *McCoy-McMahon v. Godlove*, No. 08-5989, 2011 WL 4820185, at *13 (E.D. Pa. Sept. 30, 2011)("When the victim of a RICO violation is a corporation and the shareholder indirectly suffers harm from the corporate injury, proximate cause is not met.")(citing *Penn Mont Securities*, 502 F. Supp. 2d at 466).  *Cf. In re Sunrise Sec. Litig.*, 916 F.2d 874, 879 (3d Cir. 1990)(under a RICO proximate cause analysis, depositors of a saving and loan association could not bring RICO claims in their own right because their injuries flowed from the injuries to the savings and loan).

Defendants contend Plaintiffs have failed to show causation because the injury they allege, diminution in the value of their shares, is derivative of the injuries Plaintiffs allege were inflicted on CFI by Defendants.  We agree.

We review the pertinent allegations of the amended complaint.  Defendant Lowell Gates "plotted a cynical method of enriching himself and the other defendants . . . ."  (Am. Compl. ¶ 35).  The scheme involved engineering "a sure and steady decline in

the fortunes of CFI, while falsely representing to non-defendant shareholders, including the plaintiffs, that every effort was being made to make CFI profitable." (*Id.*). As part of the scheme, "Series A Capital Notes" were issued in 2005. By way of these notes, the individual defendants lent $200,000 to CTC in exchange for repayment with interest, or upon a change in control of CFI, the ability to convert the debt to CFI shares based on the "'book value per share . . . on the closing date of the change in control.'" (*Id.* ¶ 19)(quoting the CFI 2005 annual report, n.4).[11]

Sometime before mid-2008, the individual defendants conspired with Franklin Financial to enter into the merger agreement. (*Id.* ¶ 21). Franklin Financial was to pay $1.13 million for CFI, payable to the shareholders based on the number of shares owned and the book value at the end of the month preceding the merger date. (Am. Compl. ¶ 21 and doc. 20-5, Ex. D, proxy statement, dated Aug. 8, 2008, CM/ECF pp. 1 and 35).

The merger was consummated on November 29, 2008. (Am. Compl. ¶ 67; Ex. C, doc. 20-4, CM/ECF p. 2). CFI's book value on October 31, 2008, was $.15 per share.[12] The individual defendants exercised their right to convert their notes into stock, resulting in the issuance of 1,366,380 new shares. (Am. Compl. ¶ 65). This meant that the total shares owned by the individual defendants came to over 1,470,000 while non-defendant shareholders held only 103,535. (*Id.*). This "dilution" of the shares held by the latter led to the sixty-two non-defendant shareholders (including the plaintiffs) dividing about $75,000 between them while the seven individual defendants collectively received

---

[11] Paragraph 19 says the loan went to CFI, but Plaintiffs say this is a mistake, and the loan really went to Community Trust Company (CTC), the wholly-owned subsidiary of CFI.

[12] However, the merger agreement's ultimate valuation was $.71 per share. (Am. Compl. ¶ 69).

$1,050,000, (*id.* ¶¶ 71, 72), even though before the merger the non-defendant shareholders owned a little less than 50% of the company.  (*Id.* ¶ 14).

Plaintiffs allege that to accomplish this result the individual defendants engaged, in part, in fraudulent conduct, that would cause CFI's financial condition to deteriorate, thereby providing an excuse for the merger.  The defendants "devised a scheme or artifice to defraud," (*id.* ¶ 114), "to diminish the value of CFI so more stock could be obtained by the defendants at a lower value and thus dilute the value of the plaintiffs' and other shareholders' shares and increase the portion of CFI's sale price provided to the individual defendants."  (*Id.* ¶ 116).

Defendants are accused of engaging in certain transactions that diminished CFI's value to accomplish this scheme.  "After June 30, 2008, CFI incurred additional operating losses orchestrated by the defendants . . . ." (*Id.* ¶ 63).  Franklin Financial assisted in this by using "CFI assets to pay the costs associated with completing the merger, thus driving down the value of CFI."  (*Id.* ¶ 64).  The Defendants "devalu[ed] CFI, [and] wasted [its] assets."  (*Id.* ¶ 78; see also ¶ 66).

Franklin Financial joined this scheme and benefitted by "obtaining a company with more than $70 million in assets under management, reaping estimated annual returns of $700,000, and a $500,000 corporate headquarters for a mere $1,130,000."  (*Id.* ¶ 14).  Defendants described this as a "sweetheart deal," (*id.* ¶ 14), a deal for a "bargain price", (*id.* ¶ 99), or one for a "bargain basement price."  (*Id.* ¶ 105).

It is apparent from these allegations that Plaintiffs are basing their injuries on injuries to CFI.  The injury they claim, dilution of the value of their shares, is alleged to have occurred because Defendants wasted the assets of CFI.  This injury is indirect and does not satisfy RICO causation.  *See Penn Mont Securities*, 502 F. Supp. 2d at 463, 467 (observing that "[c]orporate waste is a 'classic' derivative harm," in ruling that dilution

of the plaintiffs' shares was not actionable under RICO because it resulted from injury to the corporation).

In opposing Defendants' proximate-cause argument, Plaintiffs argue that their injury is really one to their right to maintain their proportionate ownership of CFI stock.  This is a direct injury to them, not derivative of any injury to the corporation, and satisfies RICO proximate cause.

In making this argument, Plaintiffs principally rely on *Lochhead v. Alacano*, 697 F. Supp. 406 (D. Utah 1988).  However, *Lochhead* is distinguishable.  In that case, the plaintiff shareholder in Arctic Circle, Incorporated, sued five defendants – officers, directors and majority shareholders of Arctic Circle - over a stock option plan never validly adopted, according to the plaintiff.  The plan allowed defendants to purchase 24,150 additional shares of Arctic Circle stock.  The defendants exercised this option in a later merger of Arctic Circle into Quaker State Minit-Lube, Incorporated.  In making his claim, the plaintiff relied on an injury to his right to maintain his proportionate ownership interest in Arctic Circle.  Under the terms of the merger, a fixed number of Quaker State shares were exchanged for Arctic Circle shares, regardless of the number of Arctic Circle shares outstanding.  Thus when the defendants exercised their option to purchase additional Arctic Circle shares, the defendants allegedly received proportionally more shares of Quaker State than they should have.  697 F. Supp. at 409.  Plaintiff asserted he would have received 30,194 more shares of Quaker State, *id.*, and sought as compensatory damages $728,405, his calculation of the value of the additional shares of Quaker State stock he would have received if the defendants had not exercised their stock options.

The defendants moved to dismiss this claim, arguing that it was really one for a diminution in the value of his shares, which was a derivative action, and hence not one that could be brought directly by a shareholder.  The court disagreed, noting that "'[A]

-15-

shareholder has a direct right to attack a corporate transaction which dilutes his proportionate ownership.'" *Id.* at 412 (quoting *Gordon v. Fundamental Investors, Inc.*, 362 F. Supp. 41, 45 (S.D.N.Y. 1973)).  The court also noted that neither Arctic Circle nor Quaker State had suffered any injury and that "the overall value of Arctic Circle at the time of merger was unaffected by defendants' actions since its purchase price was fixed irrespective of the number of shares outstanding." *Id.* at 411.  The court concluded that the plaintiff shareholder "had the right to maintain his relative status as a stockholder and to protect his proportionate ownership interest against fraudulent dilution," *id.* at 413, and allowed the claim to proceed.

Plaintiffs argue that *Lochhead* supports a conclusion that their RICO claims have a direct causal relationship to Defendants' conduct.  Plaintiffs argue that, just as in *Lochhead*, their injury was the dilution of the relative value of their shares, (doc. 45, Pls.' Opp'n Br. at p. 16), and that no injury was suffered by CFI as its purchase price, $1.13 million, remained the same both before and after Defendants' efforts to destroy it.

Plaintiffs' reliance on *Lochhead* is misplaced, for reasons given by the individual defendants in their reply brief.  First, and as recited above, Plaintiffs allege an injury based on the dilution of the value of their shares (Am. Compl. ¶ 116), not on a dilution of their proportionate ownership interest in CFI.  Second, this injury is allegedly the result of injury to CFI either by the wasting of its assets or by some other expenditure of its assets.  (*Id.* ¶¶ 63, 64, 78, 114).  Plaintiffs themselves cannot avoid this characterization.  (Doc. 45, Pls.' Opp'n Br. at p. 13)("The dilution of corporate assets is the proper basis for direct-action litigation . . . .").  Third, unlike in *Lochhead*, where the plaintiff sought damages commensurate with the injury to his right to proportionate ownership, Plaintiffs here seek the return of any investment they might have made in CFI.

Plaintiffs have cited other cases, *Alleghany Corp. v. Breswick & Co.*, 353 U.S. 151, 77 S.Ct. 763, 1 L.Ed.2d 726 (1957); *Borak v. J.I. Case Co.*, 317 F.2d 838 (7th

Cir. 1963); *Zinman v. FDIC*, 567 F. Supp. 243 (E.D. Pa. 1983); and *Gordon v. Fundamental Investors, Inc.*, 362 F. Supp. 41 (S.D.N.Y. 1973).  The court has reviewed these cases and finds they are distinguishable for the same reason *Lochhead* is - they all dealt with shareholder claims that their proportionate ownership in the corporation had been injured.

The court has to look at "the nature of the wrongs alleged in the body of the complaint," *Lochhead*, 697 F. Supp. at 411 (quoted case omitted).  Plaintiffs are alleging injury to the value of their shares by way of an injury to the corporation.  This is an indirect injury that is insufficient for a RICO claim.  We therefore conclude that Plaintiffs have failed to allege RICO causation on their claims.

   B.  *Plaintiffs' RICO Claims Fail Because Plaintiffs Have Not
       Pled a Pattern of Racketeering Activity*

Plaintiffs' two substantive RICO claims are based on 18 U.S.C. §§ 1962(b) and 1962(c).  Both sections require a plaintiff to show that the defendant engaged in a pattern of racketeering activity.  In pertinent part, for a claim under section 1962(b), a plaintiff must allege that the defendant: (1) "through a pattern of racketeering activity" (2) acquire[d] or maintain[ed] . . . any interest in or control of (3) any enterprise . . . ." *Id.* § 1962(b)(numbering added).  In pertinent part, for a claim under section 1962(c), the plaintiff must allege that the defendant: (1) "conduct[ed] or participate[d] . . . (2) in the conduct of [an] enterprise's affairs . . . (3) through a pattern of racketeering activity . . . ." *Id.* § 1962(c)(numbering added).

"A pattern of racketeering activity" requires a plaintiff to establish "at least two acts of racketeering activity within a ten-year period." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 364 (3d Cir. 2010)(citing 18 U.S.C. § 1961(5)).  An act of racketeering activity (otherwise known as a predicate act) is specifically defined in 18 U.S.C. § 1961(1) as certain state crimes, *id.* § 1961(1)(A), and numerous federal crimes,

including federal mail or wire fraud.  *Id.* § 1961(1)(B).[13]  "'[T]o prove a pattern . . . a plaintiff or prosecutor must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity.'"  *United States v. Bergrin*, 650 F.3d 257, 267 (3d Cir. 2011)(quoting *H.J., Inc. v. Nw. Bell Tel. Co.,* 492 U.S. 229, 244, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989))(emphasis in *H.J., Inc.*). "'Relatedness'" can be shown if the predicate acts "'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'"  *Id.* at 267 (quoting *H.J. Inc.*, 492 U.S. at 240, 109 S.Ct. at 2901).  "'Continuity'" is "'both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition.'"  *Id.* at 267 (quoting *H.J., Inc.,* 492 U.S. at 241, 109 S.Ct. 2902).

Since Plaintiffs assert Defendants engaged in a pattern involving closed-ended continuity, (doc. 45, Pls.' Opp'n Br. at p. 26), we analyze the pattern element of their RICO claims on that basis.  "'Closed-ended continuity'" can be established "'by proving a series of related predicates extending over a substantial period of time.'"  *Bergrin*, 650 F.3d at 267 (quoting *H.J., Inc.,* 492 U.S. at 242, 109 S.Ct. 2902).

In their motion to dismiss, the individual defendants maintain for various reasons that the amended complaint fails to allege the necessary pattern.  In its own motion, Franklin Financial also argues that Plaintiffs have not alleged a pattern.  We deal with the arguments separately.

---

[13]    The state crimes that can be racketeering activity are "any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year."  18 U.S.C. § 1961(1)(A).

1. *Plaintiffs Have Failed to Allege the Individual*
   *Defendants Engaged in a Pattern Of*
   *Racketeering Activity*

The individual defendants argue Plaintiffs' amended complaint fails to allege a pattern of racketeering activity for the following reasons, in part. First, the predicate acts (assuming they are predicate acts as defined by RICO) are not alleged in specific detail so that it is impossible to determine if they are related.

Second, the predicate acts, committed from 2001 through the October 2008 merger, are not plausibly related, given the stated purpose of the alleged scheme. Plaintiffs allege the scheme was to allow the individual defendants to either profit from the sale of CFI or at least minimize their losses, after wasting the corporation's assets over those years, by diluting the value of the non-defendant shareholders' stock when there was a change in control.[14] The defendants argue it is not plausible that they would have engaged in conduct ruining the company hoping that years down the line they would find a buyer which would purchase it after they had put it in financial difficulty. Moreover, even if there were plausibility, Plaintiffs have not alleged how the predicate acts are related to the fraudulent scheme, the first prong of the pattern requirement.

Third, Plaintiffs have failed to allege closed-ended continuity because the allegations support only a short term scheme with a single goal that has now been accomplished, citing *Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12, 19 (1st Cir. 2000)(single-goal scheme with a finite number of predicate acts occurring over a short period of time does not establish closed-ended continuity).

Fourth, the individual defendants argue that Plaintiffs have not adequately pled the racketeering activity. They maintain that Plaintiffs rely solely on mail and wire

---

[14]     Plaintiffs allege the scheme allowed the individual defendants, who owned 50.36% of the shares just before the merger, to claim 93% of the $1.13 million Franklin Financial paid for CFI.

fraud for the predicate acts but that the allegations do not establish either type of fraud for two reasons.  To begin with, the allegations are not specific enough in three ways.  First, they violate F. R. Civ. P. 9(b), which requires allegations of fraud to be pled with particularity, meaning allegations about the date, time or place of the fraud, or some other means of injecting precision.  *Lum v. Bank of America*, 361 F.3d 217, 223-24 (3d Cir. 2004).  Rule 9(b) also requires allegations about the substance of the fraudulent statement and the identities of the maker and the recipient.  *Id.* at 224.  Second, they fail to allege how the use of the mails or wires relates to the fraudulent scheme.  *See Richardson v. Richardson*, No. 07-4510, 2008 U.S. Dist. Lexis 55436, at *12-13 (E.D. Pa. July 22, 2008).  *See also Bonavitacola Elec. Contractor, Inc. v. Boro Developers, Inc.*, 87 F. App'x 227, 231 (3d Cir. 2003)(nonprecedential)("When mail or wire fraud is the predicate act to a RICO violation, the plaintiff must allege that mailings are related to the underlying fraudulent scheme, even though mailings need not be an essential element of the scheme and need not themselves contain any misrepresentations.")(citing *Tabas v. Tabas,* 47 F.3d 1280, 1294 and n.18 (3d Cir. 1995); *Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1413 (3d Cir. 1991)).[15]  Third, Plaintiffs allege that Defendants have collectively engaged in predicate acts and have failed to allege the specific defendants responsible for each fraudulent statement.  *See DeLage Landen Fin. Services, Inc. v. Cardservice Int'l, Inc.*, 2001 U.S. Dist. Lexis 9692, at *9-10 ((E.D. Pa. July 12, 2001).

After reviewing Plaintiff's opposition, we agree with the defendants that Plaintiffs have not sufficiently pled a pattern of racketeering activity.  In briefing the issue, Plaintiffs assert that the following are predicate acts:

---

[15]    Mail or wire fraud consists of: "(1) a scheme to defraud, (2) the use of the mails or wires for the purpose of executing the scheme, and (3) fraudulent intent." *Richardson*, 2008 U.S. Dist. Lexis 55436, at *12 (citing *United States v. Pharis,* 298 F.3d 228, 234 (3d Cir. 2002)).

> 1.  Gabriella Eisen trust fund litigation—-CTC held money in trust to pay the special needs of Gabriella Eisen.  In or around 2000-2001, Lowell Gates "authorized distribution from the trust for Gabriella's mother, contrary to the intent of the trust, using the mails, telephones, and/or emails, which would constitute mail and/or wire and/or bank fraud, as well as possibly embezzlement of pension and/or welfare funds, or unlawful welfare fund payments.  See 18 U.S.C. §§ 664, 1341, 1343, 1954."  Gates and CTC were sued over the illegal payments, leading to a settlement of $175,000, as reported in CFI' 2008 Annual report proxy.  This settlement reduced CFI's book value and capitalization.

(Am. Compl. ¶¶ 93 and 108(f)).[16]

> 2.  The *Solenberger* case--In or around August 2001, defendant, Lowell Gates, transferred the proceeds of Mary K. Solenberger's Individual Retirement Accounts (IRA) to an irrevocable trust administered by CTC.  This had unfavorable tax consequences for Solenberger.  Her estate sued Gates in state court, alleging that the transfer was intended to benefit Gates financially by allowing CTC to control Solenberger's funds, and thereby earn fees.  According to the estate, Gates's conduct reflected a pattern of self-dealing whereby Gates encouraged clients to transfer money to CTC without advising them of the unfavorable tax consequences associated with the transfer.
>
> The case settled with a substantial payout to the Solenberger estate.  Plaintiffs allege Gates engaged in fraudulent acts in connection with this transfer.  "Gates in conjunction with some or all of the individual defendants utilized the mails and/or telephone to effect this fraud upon Mary Solenberger and/or her estate in violation of 18 U.S.C. §§ 1341, 1343."  The settlement also diminished CFI's value.

(Am. Compl. ¶¶ 89 and 108(d)); doc. 45, Pl.'s Opp'n Br. at p. 20).

> 3.  The *Magaro* case–Lowell Gates advised one of his clients, Marie Magaro, to borrow against her IRA, a prohibited transaction  under federal tax law.  In January 2003, Magaro sued Gates, his law firm and CTC.  This lawsuit revealed that Gates created a conflict of interest between CTC and its clients.  It also revealed he had written a letter "propos[ing] a cover-up of the prohibited transaction from the tax authorities, a clear example of mail fraud, wire fraud, obstruction of justice, money laundering, bank fraud, and monetary

---

[16]   Paragraph 93 avers the settlement reduced CTC's book value and capitalization, but it is clear that Plaintiffs meant to say CFI.

transaction fraud in violation of 18 U.S.C. §§ 1341, 1343, 1503, 1951, 1956." "Costs and expenses from this legal matter led to the reduction in capitalization of CTC."

(Am. Compl. ¶¶ 90-92, and 108(e)).

4. The *Helm* case--CFI management, including defendant Russell, refused to give plaintiff, Patricia A. Helm, the addresses of other shareholders when she requested that information in 2007 pursuant to 15 Pa. Con. Stat. Ann. § 1508 (West Supp. 2011) so that she could investigate the management of CFI. To obtain the information she had to file suit in state court. The state court found that CFI management, including defendant Russell, had acted in "bad faith" and in a "vexatious" manner and awarded attorney's fees for forcing Helm to litigate her right to obtain this information.

According to Plaintiffs, the refusal to provide Helm with the shareholder information was a predicate act. The costs and expenses to CFI, including attorney's fees, from this legal matter reduced the book value and capitalization of CFI. Additionally, because the mails, fax machines, e-mails and telephones were used, this conduct constituted mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.

(Am. Compl. ¶¶ 96 and 108(b)).

Plaintiffs argue that these four lawsuits over a period of at least eight years establish a pattern of racketeering. We disagree, in part for the reasons advanced by the individual defendants. We first look at whether the conduct is sufficiently alleged to be a predicate act. We take each alleged predicate act separately.

The Gabriella Eisen trust fund litigation is not a predicate act. Plaintiffs assert it is because the mail and wires were used to authorize the illegal distribution from the trust fund. However, that is not enough. Plaintiffs must also allege how the use of the mails or wires related to a fraudulent scheme, the purpose of the mailings or wires

within that scheme, the fraudulent statement and perhaps (in the absence of some other precision) when and where it was made.[17]

The *Solenberger* case is not a predicate act.  Plaintiffs allege the transfer from Solenberger's IRAs to an irrevocable trust administered by CTC was fraudulent and that Gates along with unnamed other individual defendants, used the mails and/or the telephone to effect this fraud on Mary Solenberger.  However, as noted above, this is not enough.  Plaintiffs must also allege how the use of the mails or wires related to a fraudulent scheme, the purpose of the mailings or wires within that scheme, the fraudulent statement and perhaps (in the absence of some other precision) when and where it was made.

The *Magaro* case is not a predicate act.  Plaintiffs allege that a proposed cover-up of the illegal transaction by Lowell Gates in a January 2003 letter was a clear example of mail fraud, wire fraud, obstruction of justice, money laundering, bank fraud, and monetary transaction fraud in violation of 18 U.S.C. §§ 1341, 1343, 1503, 1951, 1956.  As noted above, the allegations of mail and wire fraud are not specific enough.  As for the remaining crimes, Plaintiffs do not allege the cover-up was accomplished, only that it was proposed.

Finally, the *Helm* case is not a predicate act because a violation of 15 Pa. Con. Stat. Ann. § 1508 is not listed in section 1961(1)(A) as a state-law crime that qualifies as a predicate act.[18]  *See St. Clair v. Citizens Fin. Group*, 340 F. App'x 62, 66 (3d Cir. 2009)(per curiam)(nonprecedential)("antitrust violations are not on the list of predicate acts in 18 U.S.C. § 1961(1) and, thus, cannot be the basis of a RICO claim").

---

[17]   Plaintiffs' allegations about embezzlement of pension and/or welfare funds, or unlawful welfare fund payments are also conclusory.  Plaintiffs also concede these are only "possibl[e]" violations of federal law.

[18]   In fact, section 1508 does not deal with a criminal offense at all; it gives a shareholder the right to inspect the shareholder list and to enforce that right civilly.

Nor does it help Plaintiffs that they allege the conduct also constitutes mail and wire fraud because the mail and wires were used.  An individual defendant may have used the mails or wires in connection with this conduct but, as noted above, that is not sufficient. Plaintiffs must also allege how the use of the mails or wires related to a fraudulent scheme, the purpose of the mailings or wires within that scheme, the fraudulent statement and perhaps (in the absence of some other precision) when and where it was made.

Plaintiffs point to other alleged conduct as predicate acts.  Plaintiffs allege that the individual defendants' removal of certain Plaintiffs from the boards of CTC and CFI and to withhold corporate information are part of the pattern of racketeering activity. (Doc. 45, Pls.' Opp'n Br. at p. 22).  They quote in support *Gintowt v. TL Ventures*, 239 F. Supp. 2d 580 (E.D. Pa. 2002), where the court described the RICO claim as "Defendants depriving Plaintiff of appropriate financial information and concealing . . . the actual business activities of the alleged enterprise . . . with purpose and intent of defrauding Plaintiff."  *Id.* at 584.  This language does not assist Plaintiffs.  The court was merely summarizing the RICO claim in that case and not addressing the predicate-acts requirement.

Aside from the inadequate pleading of the predicate acts, the defendants also correctly assert that Plaintiffs have not alleged a plausible pattern arising from these four lawsuits.  Plaintiffs allege a scheme whereby the individual defendants would gain financially by cashing out of the merger with the majority of the $1.13 million Franklin Financial would pay for CFI.  The individual defendants would accomplish this by diluting the value of Plaintiffs' shares.  Dilution of Plaintiffs' shares would be accomplished by wasting the corporate assets, thereby driving down its book value and benefitting the individual defendants under the terms of the 2005 capital notes.  Plaintiffs allege that the individual defendants litigated the four lawsuits because the judgments entered against

CFI, and the attorney's fees and costs involved in litigating the suits, would be one way of wasting the corporate assets.

An assertion that the individual defendants engaged in unlawful acts, leading to lawsuits, with these lawsuits being contested so that the corporate assets would be wasted is one way of showing that the predicate acts are related because they would then all serve the purpose of diluting Plaintiffs' shares. *See Bergrin*, *supra*, 650 F.3d at 270 ("relatedness" element satisfied if the predicate acts are averred to have been committed for the "same or similar purposes").  However, we agree with the defendants that it is not plausible that the individual defendants would have engaged in the alleged predicate acts, deliberately driving down the value of CFI, and then hoping they could find a company like Franklin Financial to buy it.  Two of the lawsuits, the *Solenberger* case in 2001 and the *Magaro* case in 2003, arose four and two years, respectively, before the capital notes were issued in 2005, and it was three years after that, in 2008, that Franklin Financial agreed to purchase CFI.[19]  We agree with the defendants that this is too long-range to be part of a plausible RICO claim.[20]

---

[19]    The individual defendants also argue it is implausible because the sale was forced by a 2007 mandate by the Pennsylvania Department of Banking essentially requiring that CFI have at least one million dollars in cash or cash equivalents in reserve, a requirement CFI could not meet.  The defendants argue this mandate could not have been anticipated years earlier.  We do not rely on this argument as it relies on matters outside the amended complaint.

[20]    We note that Plaintiffs have alleged other predicate acts.  CTC "repeated[ly] refused "to comply with banking laws and regulations" and this led to fees assessed by the state banking department that were much higher than they should have been.  (Am. Compl. ¶ 94).  Plaintiffs do not argue in their opposition brief that these are predicate acts (whatever the violations might have been), and we do not see how they could be under the definition of a predicate act in section 1961(1)(A).

Plaintiffs also argue in their opposition brief that the defendants committed wire fraud by temporarily wiring funds, called "intercompany receivables" from CFI to CTC "to artificially inflate stated shareholder equity to misrepresent CTC as complying with . . . capitalization requirements."  (Am. Compl. ¶ 40).  We fail to see how these actions could form part of the pattern.

### 2. *Plaintiffs Have Failed to Allege Franklin Financial Engaged in a Pattern of Racketeering Activity*

In moving to dismiss, Franklin Financial argues that no allegations are made that it engaged in any of the predicate acts set forth in paragraphs 89 through 98 of the amended complaint, only that the individual defendants did.  Defendant Franklin Financial argues that other allegations against it, (Am. Compl. ¶¶ 100, 101, 107(a) and (b)), are too vague to establish predicate acts or deal with conduct that occurred after the merger and the dilution of Plaintiffs' shares.  In opposition, Plaintiffs essentially argue that they have made sufficient allegations because they allege that Franklin Financial began a business relationship with CFI in 2004 when Franklin Financial became the administrator of the $53.5 million estate of Lowell Gates's aunt and uncle.  (Am. Compl. ¶ 76).  They have also alleged that Franklin Financial conspired with the individual defendants and, because it had engaged in due diligence concerning the merger, knew about the individual defendants' predicate acts and ratified them by agreeing to the merger.  (*Id.* ¶ 131).

We have already decided that Plaintiffs have failed to allege predicate acts by the individual defendants, so Plaintiffs cannot rely on any predicate acts by those defendants.  We have also decided that Plaintiffs have failed to allege a pattern of racketeering activity against the individual defendants.  Since Plaintiffs' position on Franklin Financial's pattern of racketeering activity is dependent on the validity of its allegations against the individual defendants, we conclude that Plaintiffs have failed to allege a pattern of racketeering activity against Franklin Financial.

C.  *Plaintiffs' Section 1962(c) RICO Claim Fails Because*
    *Plaintiffs Have Not Pled the Existence*
    *of an Association-in-Fact Enterprise*

A section 1962(c) claim has as an element the existence of an

"enterprise."[21]  Plaintiffs rely on the existence of an association-in-fact enterprise.  An

association-in-fact enterprise "must have a structure."  *In re Ins. Brokerage Antitrust*

*Litig.*, *supra*, 618 F.3d at 366 (quoting *Boyle v. United States*, 556 U.S. 938, __, 129 S.Ct.

2237, 2244, 173 L.Ed.2d 1265 (2009)).  "Specifically, it 'must have at least three

structural features: a purpose, relationships among those associated with the enterprise,

and longevity sufficient to permit these associates to pursue the enterprise's purpose.'"

*Id.* (quoting *Boyle*, 556 U.S. at __, 129 S.Ct. at 2244)).

The individual defendants argue that Plaintiffs have failed to allege these

structural elements of an enterprise.  In opposition, Plaintiffs maintain that they have,

relying principally on paragraphs 13 and 14 of the amended complaint.  Paragraph 13

alleges that the enterprise consists of Franklin Financial and the individual defendants.

Paragraph 14 provides a general description of the scheme that led to the RICO claims:

> 14.  Generally, the scheme involved Defendants Lowell
> Gates, Dunphy, Habacivich, Henry, Kohr, and Russell leading
> non-defendant shareholders, including plaintiffs, to believe
> that their business was sound.  Then, through an insider loan
> agreement with board members and management, those
> individual defendants received stock at its book value at
> change of control of CFI to Defendant Franklin Financial as
> well as interest on the loan.  Those defendants oversaw the
> diminution of assets, profited to the detriment of the plaintiffs
> and other non-defendant shareholders by receipt at or near
> the very last day of CFI's existence of more than 1.3 million
> shares of CFI that effectively diluted the value of the shares of
> the plaintiffs and other non-defendant shareholders, who had
> collectively owned approximately 100,000 shares or roughly a
> little less than one-half of the company before the stock
> dilution.  Defendant Franklin Financial benefited from the

---

[21]  As we noted above, for a claim under section 1962(c), the plaintiff must allege that
the defendant: (1) "conduct[ed] or participate[d] . . . (2) in the conduct of [an] enterprise's
affairs . . . (3) through a pattern of racketeering activity . . . ."  *Id.* § 1962(c)(numbering added).

> sweetheart deal of obtaining a company with more than $70 million in assets under management, reaping estimated annual returns of $700,000, and a $500,000 corporate headquarters for a mere $1,130,000.  In addition, Defendant Franklin Financial stated in the August 8, 2008 Proxy Statement, set forth at Exhibit D, and incorporated fully herein, that it had conducted a full due diligence review of CFI and CTC prior to the merger, and, upon information and belief, through this review was made fully aware of, and was fully complicit in the scheme.  Franklin Financial further assumed successor liability for all actions by CFI and CTC and the individual defendants, for all actions occurring prior to the Effective Date of the merger.

(Am. Compl. ¶ 14).  Plaintiffs also assert that the remaining paragraphs of the amended complaint set the scheme out in more detail.  They also point out that under *Boyle* they need not allege any kind of hierarchical structure or chain of command.  *Boyle*, *supra*, 556 U.S. at __, 129 S.Ct. at 2245.

We agree with the individual defendants that Plaintiffs have failed to allege an enterprise.  Of the three minimum structural elements, Plaintiffs have sufficiently alleged a purpose –- to allow the individual defendants to either profit from the sale of CFI or at least minimize their losses by diluting the value of the non-defendant shareholders' stock when there was a change in control, accomplished by wasting CFI's assets.  They have also alleged longevity as this allegedly took place over a number of years.  However, Plaintiffs fail to allege a relationship among those associated with the enterprise because they fail to allege facts showing a relationship between Franklin Financial and the individual defendants.  Plaintiffs attempt to show this relationship by relying on Franklin Financial's becoming the administrator of the $53.5 million estate of Lowell Gates's aunt and uncle in 2004, (Am. Compl. ¶ 76), and its decision to acquire CFI by merger and the "relationship" that developed as Franklin Financial reviewed CFI's financial condition before agreeing to the merger, at a "bargain" price.  These allegations do not establish a relationship.  They imply only unilateral action by Franklin Financial in its dealings with CFI.  Plaintiffs therefore fail to state a section 1962(c) claim.

D.  *Plaintiffs' RICO Conspiracy Claim Under
    Section 1962(d) Fails Because Plaintiffs
    Have Failed to Allege Violations of Section
    1962(b) or Section 1962(c)*

18 U.S.C. § 1962(d) makes it illegal "to conspire to violate any of the

provisions [of] subsections (a), (b), or (c)" of section 1962.  Franklin Financial and the

individual defendants move to dismiss Plaintiffs' claim under section 1962(d) on the

ground that they have failed to allege valid claims under subsections (b) and (c).  We

agree with this argument.  *See Lum v. Bank of America*, 361 F.3d 217, 227 n.5 (3d Cir.

2004)(failure to adequately plead a substantive RICO claim under section 1962(c) means

that the section 1962(d) conspiracy claim was properly dismissed).

V.   *Conclusion*

Our analysis above leaves no federal claims in the case.  As we did when

we dismissed the RICO claims before, we decline under 28 U.S.C. § 1367(c)(3) to

exercise our supplemental jurisdiction over the state-law claims.  *See Jacobowitz v. M&T

Mortgage Corp.*, 372 F. App'x 225, 228-29 (3d Cir. 2010)(per curiam)(nonprecedential).

We will therefore dismiss the action without prejudice to Plaintiffs' pursuing their state-law

claims in state court.[22]

We will issue an appropriate order.

/s/William W. Caldwell
William W. Caldwell
United States District Judge

Date: November 22, 2011

---

[22]  Plaintiffs assert that they are entitled to discovery to find support for their RICO
claims because the individual defendants were concealing their illegal activities from them.
Based on the allegations already presented, we do not think discovery would validate the
RICO claims.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MATTHEW P. AMOS,                          :

        Plaintiff                         :

                                  :

        vs.                               :          CIVIL NO. 1:CV-10-1285

                                  :

FRANKLIN FINANCIAL SERVICES       :
CORPORATION, et. al,
           Defendants                    :

*O R D E R*

AND NOW, this 22nd day of November, 2011, it is ordered that:

  1.  Plaintiffs' motion (doc. 54) for reconsideration under Fed. R. Civ. P. 59(e) is granted, and the order of May 26, 2011, is vacated.

  2.  Defendants' motions (doc. 38 and 39) to dismiss are granted in the following respect: the RICO claims in counts I, II, and III are hereby dismissed.

  3.  The court declines to exercise supplemental jurisdiction over the state-law claims in counts IV, V, VI, VII, VIII and IX, and those claims are dismissed without prejudice to filing them in state court.

  4.  The Clerk of Court shall close this file.

                            /s/William W. Caldwell
                           William W. Caldwell
                           United States District Judge